MIAMI MILITARY INSTITUTE, Plaintiff, *v.* N. LEFF, Defendant.

City Court of Buffalo, September 26, 1926.

Schools — tuition — action by school to recover balance of tuition due under contract — plaintiff expelled defendant's son because he refused to attend church other than one of his own religion — expulsion unjustified and constituted breach of contract — plaintiff not entitled to recover — contract was void as depriving defendant's son of constitutional rights — defendant is entitled to recover tuition already paid and value of son's effects retained by plaintiff.

This is an action by a school to recover from the father of a boy, whom plaintiff admitted as a student, the balance due for tuition together with a specific sum for incidentals furnished said son at the school. It appears that two weeks after defendant's son entered the institution he was expelled because he refused to attend religious services at divêrs village churches of denominations different from his own. Since the evidence precludes any finding that the defendant intended that the requirement as to religious exercises was a part of the contract between plaintiff and defendant or one of the conditions of his son's entrance in the school, the expulsion of defendant's son was without just cause and by such act plaintiff committed a breach of the contract actually made. Therefore, plaintiff is not entitled to recover any compensation whatever under the contract since it must be regarded as having forfeited all rights to the same under the circumstances.

Moreover, the contract was void as violating the constitutional rights of defendant's son in compelling him to attend and support a place of worship without his consent.

Plaintiff's complaint, therefore, must be dismissed on the merits and a judgment granted for the defendant on his counterclaim for the amount of tuition already paid and for the value of the son's effects retained by the plaintiff.

ACTION by the Miami Military Institute against N. Leff to recover balance due for tuition.

*Preston M. Albro,* for the plaintiff.

*Charles E. Doane,* for the defendant.

HARTZELL, J. This action was brought by the plaintiff to recover of the defendant the balance of $325 due for tuition of his son in the Miami Military Institute of Germantown, O., together with $65.08 for certain incidentals furnished the student at the school, the sum of $375 having been paid by the defendant to the plaintiff as an initial payment under the contract at the time the defendant's son entered the institution.

31

# 482 MIAMI MILITARY INSTITUTE v. LEFF.

The answer to this is a general denial, and sets up as an affirmative defense that on or about the 25th day of September, 1924, and within two weeks after the defendant's son entered the institute, he was expelled without just cause, by reason of which fact the defendant is entitled to said sum of $375 paid to the plaintiff· at the time the said Irving Leff, the defendant's son, entered the plaintiff's school, and on account of plaintiff's failure to perform its obligations and agreements on its part to be performed, and that said plaintiff refused and neglected to return and pay to the said defendant the sum of $375. A further defense and counterclaim is that, at the time of the said expulsion, the said defendant's son had certain personal effects and property at the school, which the plaintiff took possession of and retained, and to which the defendant is entitled, amounting in value to the sum of $138.80. The defendant, therefore, asks that the plaintiff's complaint be dismissed and for judgment of $513.80, with interest from September 25, 1924. To this affirmative defense and counterclaim a reply containing a general denial was interposed.

The case was called for trial, and the defendant, through his attorney, moved to amend his answer to set up as a valid and separate defense the following: " For a third and separate defense, the defendant admits the allegations contained in paragraphs 1 and 2 of plaintiff's complaint, and alleges that on or about the 24th day of September, 1925, the plaintiff wrongfully and unlawfully broke the contract, if any there was, by expelling the defendant from the academy, upon the grounds he did not attend church, as directed by the persons in charge; that any such provision or regulation of the plaintiff, requiring the defendant to attend church, which was contrary to his religious belief, is void, under the provisions of section 7 of article 1 of the Bill of Rights of the Constitution of the state of Ohio; that the defendant's son was of Jewish religion, and it was contrary to his religious instructions to attend the church directed to be attended by the plaintiff and its agents and unjustly interfered with his religious rights and is and was null and void under such provisions of the state Constitution." ·

Article 1, section 7, of the Ohio Constitution, referred to in said amended answer, reads as follows: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship or maintain any form of worship against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be

a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the General Assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools, and the means of instruction."

The facts in the case were stipulated by counsel for the respective parties, and it appears therefrom that Irving Leff, the son of the defendant, Nathan Leff, was a youth of the age of seventeen years; that the defendant, in answer to an advertisement of the plaintiff, wrote for a copy of the catalogue of the school, which was duly sent to him, and, after the receipt thereof, he entered his son Irving Leff as a student in the plaintiff's institution for the school term beginning the 17th day of September, 1924; that the charges for the school year were $700, including board, room and tuition, the same being payable as follows: $350 upon the entrance of the student at the beginning of the school year and the balance of $350 at the patron's option at the close of the Christmas vacation. A deposit of $25 was also required, payable when the application was made, said amount to be applied to the payment of incidental expenses.

An application blank was signed by the defendant for the admission of his son to the institute, and was mailed to the plaintiff, and thereupon the defendant's son, Irving Leff, left his home in Buffalo, N. Y., and proceeded to Germantown, O., and duly entered the school for the term beginning the 17th day of September, 1924; at said date the defendant mailed his check to the plaintiff for the sum of $375, the same being the first installment of the annual fee, together with the said deposit of $25.

The youth had been at the school for a period of about ten days when he was expelled by the plaintiff for the reason he refused to attend the Presbyterian church in the village at the Sunday services, upon the grounds that it was contrary to his religious instruction and faith, in which conduct he was sustained by the defendant. It appears that the defendant and his son are both of the Hebrew faith.

By the boy's refusal to attend the church on Sunday as above mentioned, correspondence passed between the plaintiff and the defendant in reference to the matter, wherein the plaintiff stated that the boy would be expelled unless he complied with the requirements of the school in this respect. The defendant begged the plaintiff to make an exception in his son's case in view of the fact that, being of the Jewish faith, attendance at the Presbyterian church would be contrary to his religious belief and in violation of his conscience. The youth offered to attend a synagogue of his

own faith in the village, but, there being none available, it appears that permission was given to him to attend a synagogue in a town some fourteen miles distant at his own expense, which the defendant declined to accept.

Dur'ng the ten days of the boy's presence at the institute he attended regularly to the duties of the school, which included attendance at the daily chapel where religious exercises were held by the school without objection on his part. His conduct in this respect during his entire stay at the institute was in strict compliance with the rules of the school, and met with the satisfaction of the president and faculty of the institute.

The facts in this case present an interesting and important question, and which has received careful consideration on the part of the court.

The two main questions that arise are: *First.* Does a contract between the parties grant the right to the plaintiff to recover from the defendant the full amount of the year's tuition, together with the incidental expenses as claimed by the plaintiff under the facts in this case? *Second.* If such contract existed, is such a violation of the defendant's constitutional rights, as expressed in the Ohio State Constitution, as above quoted?

We will first examine the question of the contract. The contract consists of the signed application, together with the catalogue of the institution and the correspondence that had passed between the parties at the time thereof. It will, therefore, be necessary to examine the contract in all its detail to determine whether or not there is anything in the said contract that constitutes an obligation upon the defendant's son to attend the services at the Presbyterian church on Sunday, as claimed by the plaintiff. It is apparent that the correspondence between the parties is silent upon that proposition. The matter of religious attendance was not in the minds of the parties so far as the correspondence is concerned, neither does the application suggest it in any way.

The learned counsel for the plaintiff calls the court's attention to pages 41 and 42 of the catalogue, which he claims is a regulation in reference to the subject binding upon the defendant. This subject is headed " Devotions," and the paragraph particularly referred to and upon which the plaintiff relies is found at the bottom of page 42, which reads as follows: " The cadet corps in full dress uniform, accompanied by the faculty and other members of the school family, attend the Sunday morning service of one of the several churches in the village, visiting each in turn. No creed is preferred, but genuine religious character is sought by daily devotions in the school chapel."

The counselor also refers to the paragraph on page 45, applicable to the situation, which reads as follows: " It is a condition upon which each cadet is admitted that he remain in the institute until the end of the school year, unless discharged, in which case no part of the fees will be remitted or refunded. , No deduction or refund will be made in event of suspension, dismissal, or expulsion, or for absence, or for withdrawal without the written consent of the president. For absence, caused by protracted illness, and continuing longer than four consecutive weeks, a reduction of $30 a month will be made."

It is upon these statements of the catalogue that the foundation of the plaintiff's claim must rest, and the question is, Are these statements a part of the contract between the parties, and binding upon the defendant?

The learned counsel for the defendant suggests that the first above-mentioned paragraph at the foot of page 42, in reference to the cadet corps attending Sunday morning services in one of the several churches in the village, is but a mere part of the advertisement, set forth in the catalogue to attract attention and arouse the interest of patrons. Counsel for the plaintiff, on the other hand, claims it is a regulation which he adopts by signing the application for his son and agrees to comply therewith. If the latter interpretation is true, there can be no doubt that a contract is established between the plaintiff and the defendant.

The learned counsel for the plaintiff in his able brief lays down the rule that it is a well-recognized principle of law that colleges and schools possess a discretionary power to regulate discipline as long as such rules do not violate either the divine or human law, and, in case of the refusal of the pupil to obey such reasonable regulations, he may be expelled as a matter of right. The counsel cites various cases sustaining this proposition, which the court has examined with care, although it is hardly necessary to examine at any great length authorities upon the proposition that seems to be so well established. He also advances the proposition that, where a student has entered for a scholastic year and violates some regulation of the institute that he is attending, he becomes liable, upon expulsion, to the payment of the full amount for the entire school year, called for by the contract. Authorities are cited in support of this proposition, which, as I understand it, seem to be well established.

The important question in this case is whether or not the defendant and the plaintiff entered into a contract, wherein their minds met upon the proposition in question. It will be noted, in an examination of the catalogue, that on pages 45, 46, 47 and 48 are

laid down certain matters in great detail, which are headed " Miscellaneous Regulations," among those, for example several may hereafter be mentioned merely as an illustration.

The paragraph in reference to religious attendance at church on Sunday does not come under the heading of " Regulations " in the catalogue, but under another heading, entitled " M. M. I. School Home " (Miami Military Institute School Home). Under the heading there are various things of interest and importance spoken of, which the learned counsel for the defendant aptly states should be considered in the nature of an advertisement. Under this heading there are subdivisions, as follows: Devotions, Health, Music, Military Band. Under this heading " Devotions," the small paragraph in question is found at the bottom of the page.

Under the said heading of " Devotions " there is more than a page of attractive and beautiful description of the aims of the school, in reference not only to the physical, social and mental, but also the spiritual development of the student.

There is a statement that new emphasis has been added to this work by the substitution of a special religious department at the institute, for the old method of permitting the Sunday schools of the village churches to take care of the more specific spiritual education of the boy. And, although the greatest stress has been laid upon the study of the Christian religion, the greatest truths of other religions have been considered, not in a condemnatory, but in a sympathetically critical spirit. Above all has been impressed the broad-minded acceptance of the reasonableness of religion. The second ideal sought has been accomplished by the study of men's lives, beginning with the leaders of the Old Testament times, progressing with leaders of New Testament times; a special course being devoted to the life of Jesus Christ, and ending with the study of a modern man's life at its best.

Then follows the heading " Health," which describes the location of the institution, its salubrious climate, its pure drinking water, bracing air, outdoor sports, regular habits, substantial food, sleep, indoor amusements, etc.

The next heading is " Music," wherein it is spoken of as a refining art that will be of much benefit to the student in developing the artistic side of a boy's nature.

Under the heading of " Military Band," it states that not only does this excellent organization afford instruction for its members, but also adds greatly to the pleasure of the entire school family.

It seems to me that if the attendance of a pupil was to be mandatory at some church service on each Sunday in the village of Germantown, O., to be selected by the president or the faculty

of the school, such provision would have been set forth in the catalogue under the heading of " Miscellaneous Regulations," and would have taken its place among the carefully prepared and numerous announcements of this kind set forth on pages 45, 46, 47 and 48 of the said catalogue. There are forty-one regulations of this kind, set forth in the catalogue on these pages, that become part of the contract upon the signing of the application by the patron, and which are binding upon him to the fullest extent. I am quite confident that the small paragraph, that has been quoted in reference to this matter, set out at the bottom of page 42 in the general description and discussion preceding it, concerning the advantages of a religious life and the methods employed to instill it in the minds of the pupil, has not the force of a binding character, for the last sentence of that paragraph, after describing what may be called a custom for Sunday morning service, says no creed is preferred, but genuine religious character is sought by daily devotions in the school chapel. This inference is made prominent by the president stating in plain words, in a preceding paragraph, at the top of page 42, that a special religious department at the institute has been substituted for the old method of permitting the Sunday schools of the village churches to take care of the more spiritual education of the boy.

Under these circumstances a patron might well feel that daily devotions at the chapel of this school, upon which so much emphasis has been laid by the catalogue, and as a substitute for the old method of attendance at the Sunday schools of the village churches on Sunday, was the one requirement in reference to religious attendance desired, and which he could conscientiously attend without any conflict in his faith or his conscience, whatever the same might be, and to which his son might faithfully and fairly subscribe. It is apparent to me that it was with this fact in mind that the defendant's son entered the institute and complied with all the regulations and requirements in reference to the daily exercises at the school chapel.

If my reasoning is not correct, and if the paragraph in question, notwithstanding its position in the catalogue, should be considered as one of the regulations of the school, then I am of the opinion that the same is not binding on the defendant, for the reason that its general language fails to convey the idea that attendance of the student at other churches in the village on Sunday is mandatory. To secure that effect with its corresponding obligations resting upon the student and the serious consequences of its violation, specific language should be used to clearly convey to the reader the fact of such compulsion.

As I view it, the language used is but a pleasant description of — to many — an interesting event in the life of the school. It has the lure of an advertisement of one of the attractive features of the institution. It says: " The cadet-corps attend the Sunday morning services of one of the several churches in the village, visiting each in turn."

This is no more than a brief description of a pleasing custom. It does not say the cadet corps " is required " to attend. The " cadet corps " attend the Sunday morning service, " visiting each in turn." Surely this cannot be translated to mean that each member of the corps is required to attend each Sunday the services of the several churches in the village, as contended for by the plaintiff.

At best the language used implies an occasional visit, parceled impartially among the several churches of the village. It might indeed be assumed, also, by one reading the paragraph, that a Jewish or a Catholic place of worship would be among the churches so visited.

If it had been the intention of the plaintiff to make this a condition of membership in the school and have the force of a regulation which the student was to obey, surely it would have used some language to convey that meaning. It would have been an easy matter to use specific language setting forth in plain words such requirement.

It may be suggested that any man of fair intelligence, having in mind such a requirement of so drastic a nature, and intending to convey such an important condition to a prospective patron, would at least have written, " Each student of the cadet corps, in full dress uniform, is required to attend each Sunday the Sunday morning service of the several churches in the village, visiting each in turn."

Turning to the heading " Regulations," where this paragraph belongs, if it is to have any force, we find no lack of specific language in the various regulations that are binding on the student. For example: " Cadets studying chemistry will be charged a fee of $10. Extra tuition at the rate of $50 per year will be charged. Cadets remaining for Christmas and Easter vacation will be charged $15 per week. Each cadet is required to subscribe for two copies of the *Bayonet*, which cost $3. No deduction or refund will be made in event of suspension, dismissal, or expulsion, or for absence or withdrawal without the written consent of the president. Unless the student's statement shows a credit balance, a remittance is expected by return mail. Cadets sent to the hospital will be charged $3 per day, and an additional charge will be made for nursing and meals sent to the room "— and so forth and so on,

all set forth in specific language and detail, so that he who runs may read.

To my mind it clearly appears that there was no meeting of the minds in the making of this so-called contract. It is apparent that the defendant had no idea that the requirement insisted upon by the plaintiff was a part of the contract or one of the conditions of his son's membership in the school.

My views harmonize with those of the learned counsel for the defendant, in that there was no contract between the parties to the effect that the defendant's son would attend any church other than that consistent with his own religion. The expulsion of the defendant's son from the school was, therefore, without just cause, and by such act the plaintiff committed a breach of the contract actually made, and was, therefore, not entitled to receive any compensation whatsoever called for by the contract, and thereby forfeited all rights to the same.

I also adopt the theory of the learned counsel for the defendant upon the question of waiver. I determine that there has been no waiver of the constitutional rights vouchsafed the defendant's son by the said section, quoted above, of the Bill of Rights of the Constitution of the State of Ohio. I find in the whole case no element of evidence in relation either to the contract between the parties, or any action on the part of the defendant or his son, upon which such a waiver could be predicated.

Whatever idea the plaintiff had concerning the so-called regulation was apparently hidden in the recesses of its mind, so far as the correspondence between the parties reveals, and quite obscured in the pages of its catalogue.

The contract must fail for lack of mutual understanding. There is nothing to charge the defendant with notice of any requirement concerning Sunday attendance at Christian churches for his son. It is not necessary to refer to the correspondence to establish the fact that the defendant would not have sent his son to the school had he known of this requirement.

Furthermore, I am of the opinion that if the said paragraph in reference to compulsory attendance upon Sunday services of the churches in the village could be construed as being within the purview of the parties and part of the contract between them, it cannot be sustained as valid and binding upon the defendant, for the reason that it is an unreasonable rule or regulation under the circumstances of this case.

The authorities all hold that a school has full power to enforce its rules and regulations and to carry into effect its disciplinary methods among its students, and that any disobedience of the

student may be punished, not only by suspension or other penalty, but even by expulsion from the institution, and that he still remains liable to pay the full amount of the tuition and charges for the entire year, stipulated in the contract.

But there is one important provision upon which the entire law rests in such a case, and that is that the rule or regulation must be reasonable.

The regulation that the student shall attend religious exercises at the school chapel is held to be reasonable, and a refusal of a student to comply with this requirement entails such penalty as the institution may prescribe.

But that is not the case at bar. There is no complaint that the defendant's son refused to attend the chapel services of the school. In fact it appears that he did attend such services and made no complaint thereof. The only thing that he did complain of was the requirement to attend other and different religious services, outside of the institution itself, and at churches of different denominations conducted in the village in which the school is located.

This was an unusual and unreasonable requirement, which he was justified in refusing to obey. The courts do not go so far as to sanction such a requirement. The regulations of a school in this respect that are sustained by the courts are only those requiring attendance upon the exercises or religious services conducted by the school itself, as being a part of the curriculum and instruction of the institution. Certainly the proposition to compel a student to march from one church to another of various denominations and of conflicting faiths, independent of the school itself, and located outside its boundaries and beyond its authority and control, cannot by any wild stretch of the imagination come within the principle laid down by the courts in sanctioning compulsory attendance by the student upon the religious services conducted by the school itself.

*Secondly,* I find the contract to be void as violating the constitutional rights of the defendant's son in compelling him to attend and support a place of worship against his consent. The plaintiff cites in support of its claim the case of *Board of Education of the City of Cincinnati* v. *Minor* (23 Ohio St. 211). I do not see how this case sustains the plaintiff's position in any respect.

The court holds that it has no power to interfere with the authority of the board of education to regulate its affairs and prescribe its curriculum and form of procedure and exercises.

The court remarks that counsel for the respective parties in said case have gone far afield in their argument and far outside of the issues involved, and states, in view of the wide fields of thought

covered by counsel, that the court itself feels impelled to indulge in some gene al observations upon the subject of religion.

I am of the opinion that, so far as the case goes as an authority, it supports the contention of the defendant, rather than of the plaintiff. The court says, in part, in its lengthy and able opinion:

" Do the laws of Ohio clothe its courts with power  *  *  *  to compel religious instructions and the reading of religious books in the public schools of the State?  *  *  *  Counsel for the defendants in error  *  *  *  claim to derive this authority  *  *  * from the last clause in section 7, article 1, in connection with section 2, article 6, of the State Constitution  *  *  *  [quoting].  *  *  *

" We are brought back to the question, what is the true meaning and effect of these constitutional provisions on this subject? Do they enjoin [compel] religious instructions in the schools? and does this injunction bind the courts, in the absence of legislation? We are unanimous in the opinion that both these questions must be answered in the negative.

" The clause relied upon as enjoining religious instructions in the schools declares three things to be essential to good government  *  *  *  [viz.] ' religion, morality, and knowledge.'  *  *  *  All  *  *  *  must be included " in the word " ' knowledge.' Nothing is enjoined, therefore, but the  *  *  *  means of instruction in general ' knowledge '— the knowledge of truth." To do that " is one thing; and to declare what is truth  *  *  *  and to enjoin the teaching of that,  *  *  *  is quite another thing. To enjoin the latter, would be to declare that human knowledge had reached its ultimatum. This the Constitution does not undertake to do, neither as to ' religion,' ' morality,' nor any other branch  *  *  * of  *  *  *  ' knowledge.'  *  *  *

" The real claim here is, that by ' religion,' in this clause of the Constitution, is meant ' Christian religion,' and that by ' religious denomination '  *  *  *  is meant ' Christian denomination.' If this claim is well founded,  *  *  *  it  *  *  *  would  *  *  * withdraw from every person not of Christian belief the guaranties therein vouchsafed [in the Constitution]  *  *  *."

The court discusses the subject in general terms at great length, and, after five full pages more, we quote another excerpt that seems most applicable, as follows: " Let the State not only keep its own hands off, but let it also see to it that religious sects keep their hands off each other. Let religious doctrines have a fair field, and a free, intellectual, moral, and spiritual conflict.  *  *  *  Among the many forms of stating this truth,  *  *  *  to my mind it is nowhere more fairly and beautifully set forth than in our own Constitution.  *  *  *  It is the true republican doctrine.

\* \* \* It means that a man's right to his own religious convictions, and to impart them to his own children, and his and their right to engage, in conformity thereto, in harmless acts of worship toward the Almighty, are as sacred in the eye of the law as his rights of person or property, and \* \* \* although in the minority, he shall be protected in the full and unrestricted enjoyment thereof. \* \* \* Constitutions are enacted for the very purpose of protecting the weak against the strong; the few against the many."

In considering the facts of this case, I cannot escape the thought that there is involved here a great principle that has always been regarded by the American people as the very heart beat of its national life.

This republic was founded by our forefathers, not to escape the injustice of political aggressions, but to seek freedom in a region where every man could worship God according to his own conscience. It was for this that they braved the perils of an unknown sea and the dangers of a savage wilderness.

In this connection we call to mind the words of Daniel Webster, in his oration in Commemoration of the First Settlement of New England, delivered at Plymouth, Mass., in the year 1820, when he said: " The love of religious liberty is a stronger sentiment than an attachment to civil or political freedom. That freedom which the conscience demands, and which men feel bound by their hopes of salvation to contend for, can hardly fail to be attained. Conscience, in the cause of religion, and the worship of the Deity, prepares the mind to act and suffer beyond almost all other causes. History instructs us that this love of religious liberty, a compound sentiment in the breast of men, made up of the dearest sense of right and the highest conviction of duty, is able to look the sternest despotism in the face."

It is plain to me that the strenuous effort of the plaintiff to compel the defendant's son, a boy of Jewish faith, to attend the church services of various Christian churches in the village of Germantown, against his will, and in opposition to his religious faith and convictions, is clearly a violation of his constitutional rights. This, to my mind, is so, unless the language of the Bill of Rights of the State Constitution of Ohio is composed of empty words, and the ideas and ideals of the American people as to freedom of conscience through all these years has been but a pleasant dream.

The defendant's son, a youth just on the threshold of his young manhood, buoyed up by all the alluring inducements of parental care and the flattering enticements of solicitous consideration for his comfort and happiness that the school offers to him — according

to the blandishments of the catalogue — suddenly finds himself expelled from the institution with all the attendant humiliation and disgrace. Not only that, but he finds that the plaintiff is so jealous of the sancity of the customs of the school that it feels it can best preserve them by seeking to obtain from his father the sum of $765.08 for ten days' schooling. And for what reason? Is it because the boy was manly enough not to sacrifice principle to expediency, and remained firm in his faith and convictions, and true to his conscience in spite of all threats and penalties that he might suffer?

In view of the facts that have been brought out in this case, I feel that this memorandum may well be closed by another quotation from page 42 of the catalogue: "A few minutes of every morning have been devoted to establish the habit of morning worship and to explain the great truths of Christian philosophy and ethics, while every minute of the day has been a practical application of these truths."

I cannot help but ask myself the question, What does the boy think of " the practical application of these truths? " And it seems to me that the boy's attitude is a fine example of that love of religious liberty that Daniel Webster, the great expounder of the spirit and principle of the national life of the American people, described " a sentiment in the breast of men made up of the dearest sense of right and the highest conviction of duty," that enabled this youth, far from home and fireside, a stranger in a strange land, " to look the sternest despotism in the face."

In view of the foregoing, judgment is found in favor of the defendant and against the plaintiff of no cause of action, dismissing plaintiff's complaint upon the merits, and judgment for defendant for his counterclaim in the amount of $475 and interest from September 25, 1924, together with costs and disbursements herein, amounting in the aggregate to the sum of $580.84.