[Civ. No. 8415. Fourth Dist., Div. One. Mar. 13, 1967.]

FRANK W. PORTER, an Incompetent Person, etc., Plaintiff and Respondent, v. ARTHUR MURRAY, INC., Defendant Appellant.

Gibson, Dunn & Crutcher, John J. Hanson and John H. Sharer for Defendant and Appellant.

John W. Porter and Victor Walton for Plaintiff and Respondent.

WHELAN, J.—Frank W. Porter (Porter), born in 1901, was a post office employee from 1925 until his retirement in 1957. His second wife died on November 15, 1961.

In 1961 a new and exciting life opened up for Porter: he discovered the Arthur Murray School of Dancing (School), or it discovered Porter.

The dance studio in question was located in San Diego. Such a studio had been in continuous operation since the early 1940's. It was operated first by two individuals under a

license agreement from Arthur Murray, Inc., a Delaware corporation (Murray); later the two individuals created a corporation, Burkin, Inc. (Burkin), which took over the operation by assignment from the two individuals with consent of Murray. Burkin's operation terminated in June 1962; but the operation of the studio was continued without interruption by Lonnie Snell (Snell) until about November 1, 1962, when Snell was adjudged bankrupt. Snell operated under a new license agreement rather than as the result of assignment from Burkin.

After Snell's bankruptcy there was no Arthur Murray studio in San Diego until some time in January 1963.

Porter signed 11 different contracts with School, the first on September 23, 1961, the last on July 11, 1962.

The first, called "Enrollment Agreement," dated September 23, 1961, was for "25 hours of dancing lessons" which was to expire on September [blank] 1962." School agreed it would give the lessons. The tuition recited was $365; there was said to be a cash discount of $165, and a net tuition of $200. Oddly, the full $365 was paid in two installments on September 23 and September 25.

On September 28, an "Extension Agreement" was signed. Porter agreed to extend his course of 25 hours to 309 hours for a total of $3,400 including the $365 previously paid. He made full payment of the balance the same day. The course was to expire "on Dec. 31, 1965." Again, School agreed to give the lessons.

On October 13, another "Enrollment Agreement" was signed for "850 hours . . . during the next [blank] months" for a mere $8,500. On it Porter was described as a "full Lifetime Member." It contained no promise by School.

Perhaps disturbed by the possibility that if he did not corner enough of the desirable dancing lessons they would be gobbled up by others, Porter on October 13 increased his earlier option of the same date to cover 900 hours "during [blank] months" and, of course, his life membership, for a total of only $9,750.

By December 8, the possible threat of a shortage of dancing lessons in a seller's market persuaded Porter that 1,200 to 2,232 hours additional for a minimal $11,500 was a judicious investment. Accordingly, an "Enrollment Agreement" was signed by Porter in which he agreed to take a course of from 1,200 to 2,232 hours; School agreed that it would give 1,032 hours of lessons; and Porter acknowledged he understood that

the course of 1,032 hours of dancing lessons would "expire on [blank]." The contract recited a deposit of $1,500. For the first time, the words "San Diego, Calif." appeared on the contracts.

So great a plunge in dancing lesson futures might be expected to require outside financing. Under the same date, a "Retail Installment Contract" was signed covering 1,032 lessons. Although the "Enrollment Agreement" recited a deposit of $1,500, the "Retail Installment Contract" showed that the downpayment was $5,500, the balance of $6,000 to be paid $500 monthly commencing January 8, 1962. That contract contained this provision, which was absent from any of the others: "Student may, when not in default hereunder, receive one or more lessons of instruction on his or her course contracted for hereby in any Studio operating under a franchise from Arthur Murray, Inc. and Studio agrees to pay such Studio therefor."

The "Retail Installment Contract," which was assigned on the date it bore to "Tuition Plan, Inc.," named Arthur Murray Studio San Diego as the party from whom Porter agreed to take the lessons, and who agreed to give them.

On January 13, 1962, a further "Enrollment Agreement' was signed covering 100 hours for $1,000, "due Feb. 1962," which was paid on February 7, 1962. That course of 100 hours of dancing lessons was to expire on blank date.

Having obtained the January 13, 1962 contract for $1,000, School magnanimously undertook on the same day to give a further 168 hours of dancing lessons to expire on blank date as "Payment in full for two oil paintings now in possession of the Studio." That document contained also the notation "Full Charter Membership."

Greater triumphs, however, were in store for Porter. He was given the opportunity to become a "1st Patron Charter Club Member." So rare a prize was not to be refused. On February 23, 1962, he paid a token $2,000 for that privilege. Since club membership alone might be a hollow thing, the same contract provided for 200 hours of dancing lessons for an additional $2,000, which was paid. Those lessons were to expire only when used. Porter achieved an additional coup by a provision that 50 hours should be added "for each portrait of patron charter."

It must have been obvious to Porter that for membership in an exclusive club to be meaningful, there must be an initiation. So on February 24 he signed an agreement for payment

of, and paid, the "initiation fee" of $900. This should not seem a stiff fee to ride the goat when the rider has the unique experience of being also the ridden.

Stimulated by the success of having exchanged two oil paintings for 168 hours of dancing futures, Porter again demonstrated shrewd bargaining ability. On February 24, 1962, he became signatory to a typewritten document on the letterhead of "Arthur Murray Studio." It recited:

"This Contract is between BURKIN, INC., DBA ARTHUR MURRAY STUDIO SAN DIEGO AREA, and MR. FRANK PORTER. The purpose of this contract is to establish and formulate a new Club in the San Diego area.

"Mr. Frank Porter of the El Cajon Boulevard Studio, is the first member of this Club. He will act in an advisory capacity in the planning which will be needed to get the Club established. Also, he will help to decorate, with his artistic ability, the facilities of the Club. Mr. Porter will help to draw up a Charter for the Club.

"IT IS AGREED THAT:

"Mr. Porter will paint a self-portrait [sic] of each new member. He will receive $100.00 and 50 Hours of private instruction for each finished portrait, this remuneration being for the first six portraits. For the next 10 thereafter, he will receive a straight $250 commission. Any paintings thereafter will be negotiated under a new contract."

Besides the signature of Porter, it bore the signatures of Jim Baker and two witnesses.

Another contract was signed on July 11, 1962 for "Hawaii Trip," which it seems Porter did not make. Only $42.50 was paid down.

On July 11 also was signed a contract for "Dance Olympics," 25 hours, to expire on "Sept. 10." The tuition was $390 with a net of $352 "to be applied to studio debt of $400.00 for painting contract."

The contracts of different dates were not all on the same kind of printed form. The contracts up to and including that of September 28, 1961 contained the provision: "It is further agreed that all lessons shall be arranged for a definite time." Several of the forms contained this language: "No deduction allowance or refunds for any tuition paid and due under this agreement shall be made by reason of my absence or withdrawal."

The October 13 contracts contained no promise on the part of School.

Commencing with that of December 8, the contracts, excepting the "Retail Installment Contract," the typewritten document of February 24, and the "Hawaii Trip" contract of July 11, contained this provision: "this contract is entire and not divisible."

Porter paid School not less than $30,440.

Porter received six hours of instruction weekly until the bankruptcy of Snell; the hours were assigned by School for two hours each on Mondays, Wednesdays and Fridays. Occasionally he had a special lesson.

Porter had found the studio closed about November 1, 1962, when he went to take a scheduled lesson; he was unable to find anyone connected with the studio.

He consulted a lawyer about a month after he found the studio closed. The lawyer wrote to Murray on November 30, 1962, demanding a refund of all amounts expended by Porter, claiming each of the contracts violated section 1812.80, et seq., Civil Code (the so-called Dance Act).

Murray replied on December 7, 1962, stating: ". . . negotiations are now being carried on with someone who is interested in becoming the licensee of the San Diego Studio and we hope to conclude these negotiations within the near future.

"The new licensee will, of course, honor all of the lessons remaining on the course which your client contracted for with the former licensees of the Studio."

Some time after January 1, 1963, someone purporting to be acting for School called Porter by telephone and asked if he were coming back; Porter said he was not coming back because he had put the matter in the hands of a lawyer.

The agreement between Murray and Burkin and that between Murray and Snell each contained a clause authorizing licensee to conduct a school under the name of "Arthur Murray Dance Studio" and to use the "Arthur Murray Method." Each contained provisions wholly consistent with the nonexistence of an agency relationship. Thus each provided that the licensee should pay all the expenses of the operation of the school of dancing, including taxes; and maintain liability insurance for the benefit of Murray and himself.

Other provisions indicate an intention that the licensee should give all appearances of being in business for himself under a license, such as a provision that he display conspicuously on the premises a certificate that he was licensed by Arthur Murray, and to identify himself as licensee on receipts and other documents on which he used the name "Ar-

thur Murray''; and to register as a person doing business under the fictitious name of ''Arthur Murray Dance School.''

There were other provisions which, taken as a whole with all other provisions, permit an inference that an agency relationship existed. Thus under each agreement the licensee agreed to open the school only in the exact space and location first approved in writing by Murray; to report weekly the gross receipts and pay a certain per cent to Murray; to use the minimum hourly rates of instruction established by Murray; to maintain adherence of his employees to a standard of behavior established by Murray, failure of licensee to do which should be deemed sufficient cause for immediate cancellation of the contract; not to employ any dancing instructors except those who met standards prescribed by Murray; to discharge any employee within three days after written notice from Murray to do so; to decorate and maintain the studio in accordance with a policy of making all Murray studios as nearly uniform in appearance as possible; not to furnish the names of pupils to anyone other than Murray nor to solicit any such pupil for his own or any other dancing school within three years after termination of the agreement; to deliver to Murray, upon termination of the agreement, the names and addresses of all pupils, the number of lessons contracted for by each pupil, and the amount agreed to be paid therefor, the number of lessons used by each pupil and the amount paid on account of the contract price thereof and the chart, if any, for each pupil; to authorize the telephone company, in the event of termination of the contract, to assign licensee's telephone number and listing to Murray's nominee. There were provisions under which licensee should honor the unused portion of paid courses of lessons of dancing pupils enrolled in any other Arthur Murray Dancing School owned or licensed by Murray, by giving dancing instructions to such pupils, for which the licensee was to be entitled to receive the sum of $3.50[1] per hour for each hour of instruction so given; such payment would be made by the Arthur Murray Dancing School which originally enrolled the dancing pupil, or, if necessary, by Murray; Murray agreed that it would likewise honor, or use its best efforts to cause to be honored, in any other Arthur Murray Dancing School, unused courses of lessons of any pupil who might pay for the same in the licensee's school; licensee was to pay the sum of $3.50 per hour for each hour of dance instruction given by Murray or such other

---

[1]The Burkin contract provided for $2.50 per hour.

Arthur Murray Dancing School promptly upon being apprised of the amount due; licensee agreed that he would make refunds to his pupils for unused lessons at the request of any pupil for a refund "when and if such a refund is justified"; in the event that licensee failed to make such justifiable refund, Murray, if convinced that such refund was justified, was authorized to make such reasonable refund as Murray deemed proper and charge the amount so paid to the licensee; licensee agreed to reimburse Murray upon demand or Murray could charge such payment against the deposits provided for in another paragraph of the agreement; Murray agreed to endeavor to keep such refunds to a minimum. The licensee agreed to pay an additional percentage of gross receipts in order to provide a fund out of which refunds for unused lessons might be made, or to reimburse Murray or another licensee for redeeming prepaid lessons.

The Burkin contract contained certain material provisions not found in the Snell contract. It provided that all installment contracts entered into by licensee with pupils and all notes received from such pupils should be discounted by such financial institution as might be approved by Murray.

The Burkin contract also called for Murray's written approval of decoration and layout before opening of the studio.

The Burkin contract also required Murray's prior written approval for employment of any dancing instructor, interviewer, supervisor or other employee; that all employees would sign an employment contract in a form prescribed by Murray; that Burkin would pay a scale of wages approximately the same as that paid by Murray in its New York studio, subject to local conditions; would furnish names, photographs, qualifications and references of all prospective instructors, interviewers and supervisors, and submit such prospective employees to a written examination prepared by Murray, which they must pass to Burkin's reasonable satisfaction.

In addition to the elimination of certain of the provisions in the Burkin contract quoted, the Snell contract provided that if Snell obtained a contract from a pupil while that pupil had 300 or more unused hours under any earlier contract, Snell would transmit to Murray 60 percent of all money received under the later contract, to be released by Murray only in percentage installments upon the completion of an equal percentage of the lessons covered by the contract. Snell agreed

also that in event of termination of his agreement with Murray, he would assign his lease to Murray or Murray's designee, and appointed Murray as his attorney in fact (coupled with an interest) to execute such assignment.

The certificate of license was hung in the entrance room to the San Diego studio. Burkin did file certificates of doing business under a fictitious name, employing the name ''Arthur Murray.''

The licensee who took over in January 1963 testified that he had offered Porter additional lessons without cost to Porter and without pay to himself from any source.

The general counsel and assistant secretary of Murray testified that various control features were placed in the license agreements for, among other possible reasons, the reason that ''We wanted to protect the product we had to sell, which is dancing lessons.''

### THE PLEADINGS AND FINDINGS

Plaintiff filed a complaint naming Murray, Burkin and Snell as defendants in six separate causes of action. Burkin and Snell were not served. One cause of action was to recover treble damages based upon an alleged violation of the Dance Act (tit. 2.5, Civ. Code) which was dismissed in open court upon the request of plaintiff's attorney, as was a cause of action sounding in fraud. The treble damages cause of action was dismissed because of the application of the one-year statute of limitations, to recover a penalty, asserted by Murray.[2] The case was tried upon a cause of action for breach of contract, two causes of action based upon a theory that plaintiff was a third-party beneficiary under the franchise agreements, and one cause of action in a common count for money had and received.

The trial court found that Burkin and Snell were at all times the agents of Murray and that in their dealings with plaintiff they were acting within the scope of the agency; that the controls and rights to control retained by Arthur Murray, Inc. extended beyond those necessary to protect and maintain its trademark, trade name and good will, and covered the day-to-day details and methods of the San Diego studio's operation. It further found that Murray materially breached the agreements with plaintiff and that plaintiff was entitled to recover the amount he had paid, less the value of the lessons received.

---

[2]The action was filed May 11, 1964.

The net judgment was for $27,020. Murray appeals from the judgment entered against it.

## DEFENDANT'S CONTENTIONS

Murray makes the following contentions in support of its appeal:

1. The contracts in question were not breached, since no specific time for performance is contained in the contracts and no demand for performance was ever made by plaintiff.

2. The short closing of the studio came after extensive performance had been rendered to plaintiff, caused plaintiff no damage and was, if anything, an immaterial breach of contract.

3. No actual agency relationship existed between Murray and its licensees, and Murray was not responsible for acts or omissions of such licensees.

## PRELIMINARY OBSERVAT|ON

In discussing defendant's contentions, it should be observed that the theory of a nonagency relationship between Murray and its licensees militates against the theory that no breach occurred. All but two of the contracts signed by plaintiff were made during Burkin's operation of the studio; all the money paid, with the exception of less than $100 under the July 11 contracts, and installments paid on the ''Retail Installment Contract'' after Snell took over the operation, were made while Burkin was in charge of the studio. Burkin went out of business without assigning any contracts to Snell, without notice to plaintiff, and without any novation to which plaintiff was a party. If Snell was performing Burkin's contract, it was only by reason of Snell's agreement with Murray, not by reason of any obligation owing directly to plaintiff.

If, however, a novation be assumed establishing a contractual relationship between plaintiff and Snell, that contract with plaintiff was breached when Snell became bankrupt. (*Bliss* v. *California Cooperative Producers,* 30 Cal.2d 240, 250 [181 P.2d 369, 170 A.L.R. 1009].)

In defendant's opening brief it asserts: ''Plaintiff was assured of receiving his lessons upon the reopening of the studio by defendant.''

But the theory that Murray was not a responsible party in the operations of the studio is inconsistent with the theory that the studio as such had an existence independent of the person licensed to operate it. Yet, as though the identity of

the person with whom plaintiff contracted were unimportant, defendant asserts in its opening brief that none of the contracts negates the possibility that the studio would be closed for reasonable periods of time for such things as replacement of licensees.

It is only upon the theory that Murray was the principal of the successive licensees that there can be said to have been an uninterrupted operation and an unbroken performance when Snell took over the studio.

### WAS THE FINDING OF AN AGENCY RELATIONSHIP SUSTAINED BY THE EVIDENCE?

■ Yes. It is not necessary to attempt to distinguish the numerous authorities collected by defendant, cited in support of the propositions that licensing contracts of manufacturers or distributors of nationally-distributed products or services are favored by the law; that plaintiff had the burden of proof of establishing agency; that the existence of an agency requires the agreement of the principal and of the agent to that effect; that the existence of the controls in the licensing agreement was necessary to preserve Murray's trade name; that agreements similar to the license agreements here involved have been held not to create an agency relationship; and that the language of the agreement negates the existence of an agency.

The language of the licensing agreement which it is claimed negates the existence of an agency is this: ''Licensor does not authorize or empower the licensee to use the name 'Arthur Murray' in any other capacity than as provided herein, or to sign the name 'Arthur Murray' to any contracts, documents, bills, notes, checks, drafts, leases, bonds, mortgages, bills of sale, or any other instrument in writing, or to hold himself out as a general or special agent . . .''

It may be freely asserted that one may be the agent of another without holding himself out to be such agent.

Much of defendant's argument goes only to the relative importance and weight of the various provisions of the licensing agreements and of the other evidence bearing upon the question whether an agency existed.

The case of *Shaw* v. *Jeppson*, 121 Utah 155 [239 P.2d 745], in which the Supreme Court of Utah considered the effect of such a licensing agreement, is not without interest but cannot be considered as binding upon every court that might examine the question, any more than *People* v. *Arthur Murray, Inc.,*

238 Cal.App.2d 333 [47 Cal.Rptr. 700], should be held to determine the universal accountability of Murray for the conduct of its licensees.

We are of the opinion that the evidence, and the material quoted herein, furnish substantial support for the finding of agency.

WAS PLAINTIFF REQUIRED TO DEMAND PERFORMANCE BEFORE HE COULD CLAIM A BREACH?

█ No, unless it may be said that by going to the studio for the purpose of continuing his course of lessons he was demanding performance. He found the studio closed; there was no one there from whom he could receive the scheduled instructions which, under the arrangement, had been given and were to be given on Monday, Wednesday and Friday of each week.

WAS THERE A MATERIAL BREACH OF THE CONTRACT?

█ Yes. Plaintiff had paid his full tuition. He was wrongfully excluded from the school. If it is proper to apply the rule declared in cases dealing with the wrongful expulsion of a student from a private school, plaintiff had an immediate right to a refund of the tuition paid. (*Miami Military Institute* v. *Leff*, 129 Misc. 481 [220 N.Y.S. 799]; *McClintock* v. *Lake Forest University*, 222 Ill.App. 468; note in 50 A.L.R. 1505.) See also *Olson* v. *Glens Falls Ins. Co.*, 181 Cal.App.2d 165, 170 [5 Cal.Rptr. 233].

The application of that rule in the present case would not be unreasonable. We shall discuss hereafter in more detail the effect of the "Dance Act" upon the contracts in question. Under that act, all of the contracts may be considered as one, one of the provisions of which is that it is "entire and not divisible"; there were to be no refunds; all lessons were to be for a definite time; if not taken, they were to be considered as having been given. Having wished to secure to itself the benefit of the rule that tuition paid in advance to a private school will not be refunded if the student withdraws without the fault of the school, School may reasonably be held to the complementary rule that a student wrongfully excluded has an immediate right of action for a refund.

█ Whether there is a material breach of a contract is in general a question of fact. (*Associated Lathing etc. Co.* v. *Louis C. Dunn, Inc.*, 135 Cal.App.2d 40, 49 [286 P.2d 825]; *Guerbadot* v. *Sneckner*, 185 Cal.App.2d 173 [8 Cal.Rptr. 141];

*Gold Min. & Water Co.* v. *Swinerton,* 23 Cal.2d 19, 28 [142 P.2d 22].)

 In *Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, 30, the Restatement of Contracts is cited for the following rule: "Where the acts to be performed by the promisor are connected, and the thing to be accomplished by the contract is an entirety, the breach may be total where there is a partial breach coupled with repudiation even though the promisee has fully performed the bilateral contract. (Rest., Contracts, § 316.)"

To the same effect are *Stern* v. *Sunset Road Oil Co.,* 47 Cal. App. 334, 340 [190 P. 651]; and *Dwight* v. *Callaghan,* 53 Cal. App. 132, 135 [199 P. 838]. See also *Torrey* v. *Shea,* 29 Cal. App. 313, 319 [155 P. 820], as follows: "If the instruments in question in law and in fact constituted but a single contract, the defendants were entitled to consider and declare the same rescinded and terminated upon the happening of a partial failure of consideration which resulted from the alleged willful and wrongful failure of the plaintiffs to keep and perform an integral part of the entire contract. (*Richter* v. *Union etc. Co.,* 129 Cal. 367 [62 P. 39]; *Sterling* v. *Gregory,* 149 Cal. 118 [85 P. 305].) This is so because the willful and inexcusable failure of one party to perform a material part of a contract on his part to be performed is tantamount to an abandonment of the entire contract . . ."

We recognize that in cases where the breach by the promisor is relied upon to excuse further performance by the promisee, the same rules do not apply as in cases where the promisee has already fully performed. Yet the three California authorities last cited are helpful in indicating that the determination of the materiality of the breach may in its factual aspect depend in part upon the intent of the parties.

 In the present case the defendant fixed the time of performance at three nights weekly, timing the lessons in such a manner that some 10 years would be required for completion of the lessons, assuming that plaintiff in the meantime were not inspired to pay for more lessons. Plaintiff was in his 62d year when the studio closed; despite the detailed information to which Murray was entitled as to the names of students, the amounts paid by them, and the condition of the business of the local licensee, no attempt was made to communicate with plaintiff until, through his attorney, he gave notice of his intention to regard the contract as having been abandoned by Murray. Plaintiff, to the knowledge of Murray's agent, placed

great importance on the dancing lessons; plaintiff had had no communication from anyone having to do with the studio or from Murray until Murray's letter of December 7, 1962 to plaintiff's lawyer; in the interim plaintiff might well have concluded that the contracts had been repudiated.

The court could have considered also that there had been two changes of licensee within an eight-month period, and there was no certainty that the contract would ever be fully performed.

It cannot be said, therefore, as a matter of law that the court's finding of a material breach is not supported by substantial evidence.

### The Bearing of the Dance Act

Plaintiff's first cause of action sought treble damages as provided in section 1812.94, Civil Code. To that cause of action, Murray interposed the one-year bar of section 340, subdivision 1, Code of Civil Procedure. Conceiving the defense to be well pleaded, plaintiff abandoned the first cause of action. In doing so, he did not eliminate the overshadowing fact that the contracts under question were made in violation of the provisions of sections 1812.80, et seq., Civil Code. The agreements were all executed after the effective date of the Dance Act. (Tit. 2.5, Civ. Code, effective September 15, 1961.) This act provides that performance of the agreed services will begin within six months from the date the contract is entered into (Civ. Code, § 1812.85); that all overlapping contracts shall be considered as a single contract for the purposes of this title (Civ. Code, § 1812.83); that no contract shall require the payment of an amount in excess of $500 (Civ. Code, § 1812.86); that any contract which does not comply is void (Civ. Code, § 1812.91).

As an affirmative defense, Murray had asserted the unconstitutionality of the act. The elimination of the first cause of action does not affect to Murray's prejudice its claim that the statute is unconstitutional. That question has already been settled. (*People* v. *Arthur Murray, Inc., supra,* 238 Cal.App. 2d 333.)

The contracts before the court violate in several respects the statutory prohibitions and are void. That fact does not inhibit plaintiff from recovering all the money paid on the illegal contracts, since he is a person of the class intended to be benefited by the legislation. (*Smith* v. *Bach,* 183 Cal. 259 [191 P. 14].) It does not appear from the evidence that

plaintiff, before consulting a lawyer, knew or suspected that the contracts were tainted with illegality.

■ The defaulting party who has violated the statute is not in a position to urge the illegality of the contracts as a defense to the action. (*Rossi* v. *Jedlick*, 115 Cal.App. 230, 235 [1 P.2d 1065].) Nor is Murray prejudiced by the dismissal of the first cause of action, since the applicable statute of limitations for an action to recover the money paid is not section 340, subdivision 1, Code of Civil Procedure. In an analagous situation, the two-year statute rather than the one-year statute was held to apply in an action to recover usurious interest paid, although an action to recover the penalty for usury was barred. (*Stock* v. *Meek*, 35 Cal.2d 809, 817 [221 P.2d 15].)

Plaintiff's right to recover is essentially for money had and received, whether because of the breach of defendant's obligation to furnish dancing lessons, as found by the court, or because of the invalidity of the contracts. (See *House* v. *Piercy*, 181 Cal. 247, 251 [183 P. 807]; *Thomas* v. *Pacific Beach Co.*, 115 Cal. 136, 141 [46 P. 899]; *Rose* v. *Foord*, 96 Cal. 152 [30 P. 1114]; *Lemle* v. *Barry*, 181 Cal. 1, 5 [183 P. 150]; *First Nat. Bank* v. *Thompson*, 212 Cal. 388 [298 P. 808].)

Plaintiff's fifth cause of action was for money had and received in the sum of $27,330. Defendant's answer thereto was a general denial. On those issues the court made no findings.

Plaintiff abandoned his cause of action for treble damages. The trial court might, nevertheless, have allowed a recovery on the basis that the contracts, considered as a single contract, were void. ■ The illegality might be urged for the first time even on appeal. (*Estate of Prieto*, 243 Cal.App.2d 79, 85-86 [52 Cal.Rptr. 80]; *Lewis & Queen* v. *N. M. Ball Sons*, 48 Cal.2d 141, 147 [308 P.2d 713].)

The judgment should be affirmed. We base our holding upon the findings made by the trial court, rather than upon the patent invalidity of the contracts. Had invalidity of the contracts as a ground for recovery been presented openly before the trial court, defendant might have chosen to assert the bar of limitations; that issue in turn might have restored the issue eliminated at trial which had been stated in the pretrial order: whether Porter was not incompetent at the time of signing all the various agreements. It is apparent from the face of this record that Porter from some cause or another was

likely to be deceived and imposed upon by artful and designing persons.

Judgment affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied March 28, 1967.