[Civ. No. 67618. Second Dist., Div. One. Aug. 2, 1984.]

BENJAMIN GRADUS et al., Plaintiffs and Appellants, v.
HANSON AVIATION, INC., Defendant, Cross-defendant and Appellant;
WILLIAM KNOTT, Defendant, Cross-defendant and Respondent;
AIRWORK SERVICES DIVISION OF PACIFIC AIRMOTIVE, INC.,
et al., Defendants, Cross-complainants and Appellants.

RANGER INSURANCE COMPANY, Plaintiff and Appellant, v.
AIRWORK SERVICES DIVISION OF PACIFIC AIRMOTIVE, INC.,
et al., Defendants and Respondents.

1042

## COUNSEL

Ronald L. M. Goldman, Hawkins & OConnell and Mark A. OConnell for Plaintiffs and Appellants.

Reid & Axelrod and Peter Axelrod for Defendant, Cross-defendant and Appellant, for Defendant, Cross-defendant and Respondent and for Plaintiff and Appellant Ranger Insurance Company.

Kirtland & Packard and William T. Delhagen for Defendants, Cross-complainants and Appellants and Defendants and Respondents.

## OPINION

**CARSTAIRS, J.***—Several claims arising out of a helicopter crash were consolidated. This is an appeal from judgments following a jury trial in favor of plaintiffs Gradus and Freeman against Hanson Aviation, Inc. (the operator of the helicopter), in favor of defendant Knott (the pilot), against plaintiffs, Gradus and Freeman, and from a judgment of nonsuit in favor of Airwork Services et al. against Ranger Insurance Company. This is an appeal from judgments following a jury trial and from a judgment following a nonsuit in that trial.

We affirm the judgments.

*Assigned by the Chairperson of the Judicial Council.

BACKGROUND

A Bell helicopter (hereinafter called Flight 41) crashed in the course of a charter flight on June 22, 1976, seven miles west of Bishop, California. The occupants were the pilot, William Knott, Ben Gradus, a film producer, James Freeman, film producer/director, and Ray Fragasso, an advertising account executive.

The purpose of the flight was to find suitable locations for a Kodak commercial to be later filmed in the Sierra Nevada mountains. Flight 41 was owned by one Alfred Wilsey (not a party to this lawsuit) and leased to Hanson Aviation, Inc. (hereinafter HAI), Dean Hanson, President.

The engine failed while the helicopter was in flight, just before the crash. Freeman and Fragasso were killed. Gradus and Knott were seriously injured.

The crash occurred in a steep, wooded, area. A meadow was nearby. Flight 41 was demolished.

The aircraft was originally manufactured by Bell Helicopter Corp. (not a party). Twice before this accident it had been involved in other accidents and had been substantially rebuilt. Five of the parties herein contributed parts or services to rebuilding. They are Airwork Services Division of Pacific Airmotive, Inc.; Aviation Power Supply, Inc.; Chandler Evans Division of Colt Industries; Detroit Diesel Division of General Motors; Schultz Enterprises, Inc.; Helicopter Maintenance, Inc.; Oregon Helicopters, Inc. (hereinafter they will be referred to collectively as the Hull Defendants). Ranger Insurance Company insured the hull.

The work of reassembling Flight 41 in its most recent rebuilding was done by Helicopter Equity Corp. (hereinafter HEC), Alan Zamore, President, at facilities supplied by Schultz Enterprises, Helicopter Maintenance, Inc., and/or Oregon Helicopters (hereinafter collectively the Schultz entities).

On May 4, 1976, Hanson took delivery of Flight 41 for Wilsey who then leased it to HAI. HAI operated several aircraft, fixed wing and rotary. While being operated by HAI, Flight 41 had been chartered eight to ten times before the fatal flight.

Freeman arranged for the charter with HAI on the basis of an hourly rate.

During the flight, at about 11 a.m. the "engine out" light came on and Flight 41 crashed. In the night a fire broke out at the crash sight which burned the injured Gradus. The survivors were rescued the next morning.

### THE SETTLEMENTS

The Fragasso and Knott claims for damages were settled. Wilsey settled with all plaintiffs and won summary judgment as to all cross-complaints for indemnity. HEC and Zamore settled with all plaintiffs. The Hull Defendants settled with Gradus and Freeman and agreed to share in the defense (with one lawyer representing all) and to apportion any judgment on their claim for indemnity. Ranger released Bell upon its surrender of its claim for indemnity against HAI, Knott and Hanson; and plaintiffs and cross-complainants dismissed Dean Hanson individually in return for a waiver of costs.

### THE CLAIMS IN THE LAWSUITS

These cases remain:

Decedent Freeman's mother and Gradus against HAI and Knott for damages for negligence.

Ranger Insurance against the Hull Defendants for its subrogated hull damage payment.

The Hull Defendants (as cross-complainants) for indemnity against HAI and Knott.

### THE JUDGMENTS

The jury rendered a unanimous verdict for Gradus against HAI in the amount of $1,130,000, and for Freeman against HAI in the amount of $250,000. It found in favor of Knott against both plaintiffs (10-2). The court granted a nonsuit against Ranger Insurance in its claim against the Hull Defendants.

Judgments were entered by the court against HAI in favor of the Hull Defendants on their cross-complaints for indemnity in the amounts they had paid Gradus and Freeman in settlement. The judgments in favor of Gradus and Freeman were reduced accordingly.

### CONTENTIONS OF FREEMAN AND GRADUS

Plaintiffs Freeman and Gradus contend that HAI was negligent in failing to inspect Flight 41 properly to discover loose fittings which caused the

engine failure and in failing to comply with other applicable provisions of the Federal Aviation Safety Regulations.

The court instructed on the standard of care required of a common carrier, and on *negligence per se,* as well as on ordinary negligence.

HAI contends there was prejudicial error in giving the common carrier instructions and the *negligence per se* instructions. It also urges that there was not sufficient evidence to support a verdict against it.

■ It is well settled that appellate review of the sufficiency of evidence is governed by the substantial evidence rule. (*Merrill* v. *The Department of Motor Vehicles* (1969) 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].) "[T]he power of the appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (Italics in original.) (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].)

■ Moreover, " 'in examining the sufficiency of the evidence to support a questioned finding an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.' " (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

HEC bought the wreck of a helicopter which had crashed in 1972 and commenced the rebuilding over a period of about three years. For two of those years, one Gustafson, an FAA certified mechanic, worked with a crew of mechanics varying between five and ten at a time in number. A rebuilt engine was installed and almost everything was rebuilt from the bottom up.

Notwithstanding the crash and the subsequent fire, the engine and most of the components, including the air frame fuel filter, were intact and examined by plaintiffs' experts. The experts agreed that the engine was not developing power at the time of the impact and air ingestion into the fuel lines at the air frame fuel filter was the probable cause of the engine flameout. At the scene of the crash, investigation established that both of the fuel line B-nuts to the air frame fuel filter were loose. The circumstances of the crash could not have resulted in the loosening of the B-nuts. There was expert testimony to the effect that the B-nuts were loose enough to allow the introduction of air into the fuel system. The engine manufacturer, De-

troit Diesel Allison issued the following commercial service letter, "All fuel lines must be properly torqued. It is possible to have a leak in a fuel line anywhere from the tank to the outlet of the engine fuel nozzle which will suck air but won't leak fuel. A slug of air to the fuel nozzle may cause a flameout."

The "Bell Helicopter Company manual, Maintenance-Overhaul Instructions Models 206A and 206B" specifies the proper torque values. (Flight 41 was 206B.) These values cannot be obtained visually. A common tool called a torque wrench is required. Although Gustafson knew that loose B-nuts on the air frame fuel filter are a common problem and can be sufficiently loose to allow air to be ingested into the helicopter's fuel system while not allowing fuel to leak out, he nevertheless did not use a torque wrench in tightening the B-nuts.

The helicopter was rebuilt by air frame and power plant mechanics in their spare time after other regular jobs, in the evenings. They had no particular method of checking their work or checking each other for their work, and no plan for the rebuilding.

One Comey was HAI's lead mechanic. Hanson knew the foregoing circumstances but did not tell Comey of them. Comey testified that had he known them, he would have performed a major inspection which would have included checking the B-nuts for proper torque. However, only visual inspections were performed by HAI and these did not include establishing the tightness of the B-nuts. These nuts were easily accessible.

■■■ HAI assigns error to the court giving the instruction concerning common carriers, contending that the evidence established that as a matter of law it was a private carrier.

In pertinent part, the instruction reads: "[P]laintiffs have the burden of establishing . . . all the facts necessary to prove the following issues:

"1. That Hanson Aviation, Inc. undertook either expressly or by course of conduct generally and for all persons indifferently to carry and deliver them for hire, so long as it had room."[1]

The instruction correctly states the law. It incorporates the criteria set forth in *Smith* v. *O'Donnell* (1932) 215 Cal. 714, 718 [12 P.2d 933].

---

[1]The instruction reads further as follows: "1. That Hanson Aviation, Inc., undertook either expressly or by course of conduct generally and for all persons indifferently to carry and deliver them for hire, so long as it had room.

"If you find that Hanson Aviation, Inc. was not a common carrier, then it was a private carrier."

We also approve as correct the further language of the common carrier instruction.

"[Y]ou may consider any of the following factors:

"Whether it maintained a regular place of business for the purpose of carrying those who applied;

"Whether it advertised its services to the public generally; . . ." *O'Donnell, supra,* expressly made these proper criteria. (*Id.,* at p. 718.)

There was substantial evidence showing that HAI had two fixed places of operation, San Carlos and Pier 46A, and owned a mix of fixed and rotary winged aircraft. On and before the date of the accident HAI was actively engaged in the charter and lease business and had four to five aircraft available for those purposes from January through June 1976. Flight 41 was purchased to fill a need for executive transportation of people in and out of downtown San Francisco. Under its agreement with Wilsey HAI was to use the helicopter for commercial aviation purposes including transportation of passengers and freight for hire. The charge per hour for Flight 41 was standard regardless of where it was to go. In the period of time that HAI had Flight 41 it chartered that aircraft alone some eight to ten times before the crash under the same type of payment arrangements that HAI used for the flight in question.

HAI advertised its charter services to the general public since at least the fall of 1972 and ran among other advertisements telephone directory yellow page advertisements which among other matters invited the *public* to "fly direct from the city. Save time and money."

For the fatal flight Freeman telephoned Hanson and arranged over the telephone for the charter of the helicopter at an hourly rate without any difficulty.

 *Jackson* v. *Stancil* (1960) 253 N.C. 291 [116 S.E.2d 817], is a leading case in this field and follows California law. It sets forth factors which can be considered and factors which are not to be considered in determining that question of common carriage: A carrier need not have a regular schedule of flights; a fixed route, or an air taxi certificate. Important factors are: an established place of business; engaging in the operation as a regular business, not as a casual or occasional undertaking; standard charges; and advertising.

 Notwithstanding that HAI disputed the status of common carrier it is evident that there was sufficient evidence to justify the instruction and it

was a question of fact to go to the jury. We have reviewed the additional criteria proposed by HAI and refused by the court. The second criterion of the proposed instruction was covered in the instruction actually given. ■ The third requires the proof of a negative by plaintiff, i.e., that HAI did not contract to render a special service in this case, which is not their burden.[2]

The instructions were not incomplete, therefore.

■ HAI further contends that the instructions on the standard of care of a common carrier were incorrectly stated.

"A common carrier is bound to provide vehicles, such as the helicopter in question in this case, that are safe and fit for the purposes to which they are put, and is not excused for default in this respect by any degree of care."

The language incorporates the provisions of section 2101 of the California Civil Code.

HAI contends that this conveys the impression to the jury that a common carrier is absolutely liable for injury regardless of whether utmost care and diligence has been used. However, any ambiguity in that respect is cured by the following detailed instruction:

"A common carrier does not guarantee the safety of its passengers.

"The care . . . is the highest that reasonably can be exercised consistent with the mode of transportation used, and the practical operation of its business as a carrier."[3]

---

[2]Provisions of Evidence Code section 500: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

[3]The full instruction reads as follows: "If you find that Hanson Aviation, Inc. was a common carrier then you should apply the following definition of negligence:

"A common carrier of persons for hire must use the utmost care and diligence for their safe carriage and must exercise a reasonable degree of skill to provide everything necessary for that purpose.

"Failure on the part of such carrier to meet the foregoing standard of conduct is negligence.

"A common carrier does not guarantee the safety of its passengers.

"Its responsibility is not to use the most effective methods for safety that the human mind can imagine or that the best scientific skill might suggest. The care required of it, however, is the highest that reasonably can be exercised consistent with the mode of transportation used, and the practical operation of its business as a carrier. This requirement must be measured in the light of the best precautions which, at the time of the accident in question,

The law was not misstated. The totality of the instructions gives a clear standard to the jury.

(7) HAI next addresses the instruction that as a matter of law Federal Air Regulations (FAR) Part 135 applied to it.

The relevant portions of these regulations (14 C.F.R. § 135.1) are:

"(a) Except as provided in Paragraph (b) of this section, this part prescribes rules governing—

"(1) Air taxi operations . . .

"(3) The carriage in air commerce by any person, other than an air carrier,[4] of persons or property for compensation or hire (commercial operations) in small aircraft and,

"(4) Each person who was on board an aircraft being operated under this part.

"(b) This part does not apply to—

"(1) Student instruction;

---

were in common, practical use in the same business and had been proved to be effective.

"If, on the other hand, you find that Hanson Aviation, Inc. was a private carrier, then the definition of negligence is as follows:

"Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

"It is the failure to use ordinary or reasonable care.

"Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.

"You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, not the exceptionally skillful one, but a person of reasonable and ordinary prudence.

"One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If the answer to that question is 'yes', and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence.

"The amount of caution required of a person in the exercise of ordinary care depends upon the conditions apparent to him or that should be apparent to a reasonably prudent person under circumstances similar to those shown by the evidence."

"[4]The term 'air carrier' as used in § 135.1(3) is a term of art generally applied to airline operations, and is defined and governed by FAR Part 121."

"(2) Non-stop sightseeing flights that begin and end at the same airport, and are conducted within a 25-mile radius of that airport;

"(3) Ferry or training flights;

"(4) Aerial work operations, including—

"(i) Crop dusting, seeding, spraying, and bird chasing;

"(ii) Banner towing;

"(iii) Aerial photography or survey;

"(iv) Fire fighting;

"(v) Rescue operations;

"(vi) Helicopter operations in construction or repair work (but not including transportation to and from the site of operations); and

"(vii) Powerline or pipeline patrol; . . .

HAI admits that it falls within the provisions of section 135.1(a)(3), but contends that the court erred in giving this instruction as HAI had introduced evidence establishing that it came within one of two exceptions, i.e., sightseeing in (2) or aerial photography or survey in (iii).

Neither applies under the facts. There was no evidence of any restrictions having been placed on the mileage of the flight. The aircraft had enough gasoline for two and a half hours of flight. Therefore, (2) does not apply. A simple answer to part of the contention that (iii) applies is that there is no evidence whatsoever that photography of any kind was intended or performed.

Appellant HAI urges us to give the word survey a wide or general definition, i.e., "look over." We decline to do so and hold that the plain meaning of the word in the subdivision where it is found is modified by the adjective "aerial" which precedes the word photography. The mission was not to "ascertain boundaries, make maps, or lineal or angular measurements and the like." (Webster's Internat. Dict. (2d ed. 1937) p. 2540.) To the extent that the word occasionally is used in a general sense, i.e., "to look over," we reject such definition in this context.

The result of the application of Part 135 was to subject HAI to a number of requirements including the filing of a flight following plan, pilot

training and retesting. However, under instructions given, HAI could not be chargeable with negligence per se unless the violation of one or more of these provisions was found by the jury to be a proximate cause of the disaster.

It should be noted that the jury was charged with the applicability of another provision of the Federal Aviation Regulations as follows: "The owner or operator of an aircraft is primarily responsible for maintaining that aircraft in an airworthy condition."

Appellant assigns no error in the giving of that instruction.

 Even if there were error arguendo in the formulation of any of the jury instructions called into question by appellant, section 475 of the California Code of Civil Procedure would apply. In pertinent part, this section provides:

"No judgment . . . shall be reversed or affected by reason of any . . . instruction . . . unless it shall appear from the record that such . . . instruction . . . was prejudicial . . . and that a different result would have been probable if such . . . instruction . . . had not occurred or existed."[5]

We have reviewed this record and hold that it is not probable that a different result would have been reached by the jury in the absence of the claimed errors in these instructions.

 As to HAI's contention that the jury verdict in favor of these plaintiffs against it is not supported by substantial evidence, we find it untenable. There was substantial and persuasive evidence supporting the verdict.

Appellant's remaining assignments of error in respect to plaintiffs' verdict against it have been considered and are found to be without merit.

### THE KNOTT VERDICT

The jury found in favor of the pilot, Knott, against plaintiffs Freeman and Gradus, who appeal from this judgment as do the Hull Defendants.

---

[5]Code of Civil Procedure section 475. "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

 The basis of the appeal is the refusal of the trial court to give an instruction on conditional res ipsa loquitur.

The facts are these: Knott is a pilot with many years of experience, in both fixed winged aircraft and helicopters. There is a standard technique in piloting helicopters known as autorotation. Simply stated, autorotation is the controlled descent of a helicopter by its pilot without engine power. When commenced from a sufficient altitude, it is normally possible to make a safe landing where suitable terrain is in the area. A meadow was close to where the helicopter crashed. There was general agreement among the several experts who testified on both sides that there is an altitude below which successful autorotation cannot be made. This is called "Dead Man's Zone." It is possible, therefore that if Flight 41 had been at a sufficient altitude when the engine flamed out, it could have autorotated to a safe landing in the meadow, notwithstanding the engine failure.

Knott had survived a number of successful autorotations during his career as a helicopter pilot. However there was also general agreement among the experts that speed and wind velocity as well as altitude were factors affecting a successful autorotation as well as altitude.

There was no credible testimony as to any of these variables, however. Knott was called as a witness by plaintiffs under section 776 of the Evidence Code, and during his testimony, he gave the following answers to questions by plaintiff Gradus' attorney.

"Q. At the time that the accident occurred you were not exactly scouting the location? You were going from one place to another, weren't you?

"A. I *think* I was going back to the airport.

"Q. All right. So you were going from the location you had seen back toward Bishop?

"A. Yes, sir.

"Q. You were not in the process of scouting the location at that time, were you?

"A. I don't *think* so, no.

"Q. This might be called a return leg on the flight, for example?

"A. Yes.

"Q. So that must have meant that you were in cruising flight?

"A. It *must* have.

"Q. All right. So there was no requirement that that return flight be conducted close to the ground, was there?

"A. No.

"Q. And, in fact, there was no reason that that flight had to be conducted inside the deadman's zone for this helicopter, true?

"A. True." (Italics added.)

The parties who are appealing the judgment in favor of Knott all urge this testimony in support of the proposition that a conditional res ipsa loquitur instruction should not have been refused.

They cling to a gossamer thread. The totality of the testimony of Knott makes this conclusion unacceptable. Knott had no memory of the circumstances immediately following the "engine out" warning light. Many questions put to him before and after concerning the tragic events were answered by the phrase "I don't recall" or its equivalent.

"By Mr. Goldman:

"Q. What is the first recollection that you have that is a firm recollection in your mind as to an event after the liftoff from Bishop?

"A. The flight in the air ambulance taking off from Bishop, taking me back to San Mateo.

"Q. All right. And that was—what?—over a week after the accident? Somewhere around a week?

"A. Somewhere around there."

It is clear from the evidence that he sustained brain injury and recalled nothing from the moment immediately after the "engine out" light up to a week after the disaster. In fact the trial court properly ruled that the answers he gave to NASB investigator when he was interviewed by him in the hospital were inadmissible because of the lack of a foundation that his answers were reliable and trustworthy. He had no recollection at the time of trial of having given them. It is equally clear to us that the answers quoted above

are equally untrustworthy when considered in the totality of his testimony. They cannot constitute reliable evidence of what they purport to indicate.

It is also clear that landings or descents very close to the terrain might well have been included in the mission requirements of Flight 41, which was scouting locations for a commercial film.

The instruction which was refused by the court was as follows: "On the issue of negligence, one of the questions for you to decide in this case is whether the [accident] [injury] involved occurred under the following conditions:

"First, that it is the kind of [accident] [injury] which ordinarily does not occur in the absence of someone's negligence;

"Second, that it was caused by an agency or instrumentality in the exclusive control of the defendant [originally, and which was not mishandled or otherwise changed after defendant relinquished control]; and

"Third, that the [accident] [injury] was not due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of his injury.

"If, and only in the event that you should find all these conditions to exist, you are instructed as follows:"

It correctly states the law of Conditional Res Ipsa Loquitur.

The question for us to decide is whether the instruction was justified under these facts.

As to paragraphs numbered Second and Third of the refused instructions there can be no question. They apply. The issue arises as to paragraph numbered First.

" '[T]he applicability of the doctrine of res ipsa loquitur depends on whether it can be said, in the light of common experience that the accident was more likely than not the result of [defendant's] negligence. [Citations.] "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply.' " . . .

"All of the cases hold, in effect, that it must appear, either as a matter of common experience or from evidence in the case, that the accident is of a type which probably would not happen unless someone was negligent. In

the absence of such a probability there would be no basis for an inference of negligence which would serve to take the place of evidence of some specific negligent act or omission. The defendant, of course, should not be liable unless it appears from all the facts and circumstances that there is a sufficient causal connection between his conduct and the plaintiff's injury, . . ." (*Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 442-443 [247 P.2d 344].)

 Is this the kind of accident (the unsuccessful autorotation) which ordinarily does not occur in the absence of someone's negligence? We think not.

To reach that conclusion would be to "fling a plank of hypothesis over an abyss of uncertainty."[6]

*If* Knott had been in the Dead Man's Zone, and *if* there had been no mission requirement that he be there at the time of the engine flameout or, on the other hand, *if* he had been higher, and *if* the wind and speed conditions had been favorable for a successful autorotation, the instruction might be arguable (even though there appear to be no guarantees of a successful autorotation even by a skillful pilot).

 To justify such an instruction as the one sub judice a party must present some substantial evidence, which, if believed by the jury, would entitle it to draw an inference of negligence from the happening of the accident itself. (*Kerr* v. *Bock* (1971) 5 Cal.3d 321, 324 [95 Cal.Rptr. 788, 486 P.2d 684].)

 Taking the totality of his testimony it is evident that Knott has simply no recollection whatsoever of the circumstances of the crash from the moment when he saw the "engine out" light. The compliant answers set forth above and relied upon by plaintiffs are guesses, pure and simple. Time after time, throughout his lengthy testimony, his answers are "I don't recall." The conclusion is inescapable that these responses quoted by plaintiffs cannot be regarded as admissions of fact, and hence cannot serve as the basis of a res ipsa instruction.

There was no substantial evidence. There was only speculation. Under these circumstances, to give the instruction would have been error. To refuse it was not.

---

[6]From *The Descent of Man,* a short story by Edith Wharton. The Collected Short Stories of Edith Wharton, Volume 1 Edited by R.W.B. Lewis.

### THE NONSUIT OF RANGER

Ranger Insurance Company insured the owner of Flight 41, Wilsey, and paid him $125,400 for the damage to the helicopter. It now sues the Hull Defendants on its subrogated claim. For a theory of liability of the Schultz entities, it contends that the B-nuts were improperly tightened by Gustafson while he was an employee of Schultz, making Schultz responsible under the doctrine of respondeat superior. For a second theory of liability, Ranger argues that particle contamination in the fuel of the aircraft caused the sticking of a bypass valve in the fuel control, and this in turn caused the power failure in the engine. It claims that the design of the fuel control was defective, and the engine manufacturer, Detroit Diesel Division of General Motors (hereinafter DDA) and Chandler Evans Division of Colt Industries (hereinafter CECO) the manufacturer of the fuel control, were responsible. The standard of review which Ranger must meet is set forth in the case of *Ulwelling* v. *Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 104-105 [23 Cal.Rptr. 631].

 "Thus, before a judgment of nonsuit can be disturbed, there must be some substance to the plaintiff's evidence upon which reasonable minds could differ; proof that raises mere speculation, suspicion, surmise, guess or conjecture is not enough to sustain his burden. [Citations.] '. . . "It is not necessary that there should be an absence of conflict in the evidence. To deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one." [Citations.]' "

 As for the respondeat superior theory of Schultz' liability for Gustafson, the evidence was that Gustafson was hired by HEC and Zamore, and his direction and control came from Zamore, who was President of HEC. Schultz had nothing to do with the actual rebuild. Its only involvement in the enterprise was that Gustafson's paychecks came through Schultz. This however, as explained by Zamore, was an arrangement of convenience, because Schultz had the apparatus to issue paychecks and keep records and HEC was not qualified in California to do so.

However, HAI urges that there was a joint venture between Schultz and HEC and Zamore. It bases this on an agreement that Schultz was not to receive rent for the premises and compensation for its bookkeeping services until the helicopter was sold. In that event, Schultz was to be paid reimbursement and a fixed amount for its contribution to the enterprise ($5,000).

This arrangement, however, does not meet the criteria for a joint venture. (See *Bank of California* v. *Connolly* (1973) 36 Cal.App.3d 350, 364 [111 Cal.Rptr. 468].) "An essential element of a . . . joint venture is the

right of joint participation in the management and control of the business. [Citation.] Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a . . . joint venturer. [Citations]."

 Turning to the theory of particle contamination, the record discloses no evidence whatsoever of any particle contamination having been found. All the evidence supports the finding that the fuel system had been flushed, was kept clean and the sources of gasoline introduced into the system were reputable and the fuel was free of contamination. Furthermore, expert testimony established that the fuel filter was clean on both sides, and the expert opinion was that no contamination had flowed through the filter.

As to design defect by CECO or DDA, there was simply no competent evidence of its existence. Appellants argue that a bulletin calling for a change in the filter pore size, from 10 microns to 5 microns, made after this accident, demonstrates a design defect. The evidence shows that the change was made for reasons completely apart from any problems suspected to result from fuel contamination. In fact, there is evidence that this engine with a 10 micron filter, upon exhaustive testing, had been found to have no contamination problem.

 The court found no evidence either of negligence or product liability on the part of any of the Hull Defendants, and we hold that the record fully supports that conclusion.

Accordingly, we find no merit in any of the assignments of error.

The judgments are affirmed.

Spencer, P. J., and Lillie, J.,* concurred.

The petition of appellants Hanson Aviation, Inc., and Ranger Insurance Company for a hearing by the Supreme Court was denied September 26, 1984. Bird, C. J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.