[No. G010240. Fourth Dist., Div. Three. Mar. 25, 1992.]

RONALD CISLAW et al., Plaintiffs and Appellants, v.
SOUTHLAND CORPORATION, Defendant and Respondent.

COUNSEL

Girardi, Keese & Crane, Thomas V. Girardi and James B. Kropff for Plaintiffs and Appellants.

Solish, Jordan & Wiener, James V. Jordan and Judith B. Gitterman for Defendant and Respondent.

Patrick E. Dandino, Bartko, Welsh, Tarrant & Miller and Charles G. Miller as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SONENSHINE, J.**—Ronald and Carole Cislaw appeal from a summary judgment entered in favor of The Southland Corporation in this action arising out of the alleged wrongful death of their son, Timothy. The Cislaws contend the court erred in deciding Southland was not vicariously liable for the sale of clove cigarettes from a franchised 7-Eleven store. They argue the evidence gave rise to conflicting inferences, requiring a jury determination of employment, agency, partnership and joint venture issues.

### I

Timothy Cislaw, 17 years old, died of respiratory failure on May 10, 1984. His parents filed a wrongful death action alleging Timothy's death resulted from his use of Djarum Specials clove cigarettes sold at a Costa Mesa 7-Eleven store. Southland owns the 7-Eleven trademark and is the franchisor of California 7-Eleven stores. The Costa Mesa 7-Eleven was franchised to Charles Trujillo and Patricia Colwell-Trujillo. The complaint, seeking compensatory and punitive damages, stated causes of action for negligence, breach of implied and express warranty, product liability and infliction of emotional distress.

After answering the complaint, Southland moved for summary judgment asserting (1) it had no direct liability for Timothy's death, and (2) it had no vicarious liability based on the Trujillos' conduct because, as franchisees of the 7-Eleven store, the Trujillos were independent contractors as a matter of law. In support of its motion, Southland presented the declarations of Colwell-Trujillo and a Southland management employee, Arthur Salcido, both of whom attested to facts indicating the franchisees were independent contractors. Southland further relied upon the franchise agreement itself to negate any issue of agency.

The Cislaws neither interposed evidentiary objections to Southland's declarations nor presented controverting evidence. Rather, they relied solely on the franchise agreement, asserting it could be interpreted to demonstrate an employment or agency relationship. The trial court, asked to make a legal determination on uncontradicted facts, decided as a matter of law the Trujillos were independent contractors and granted Southland's motion for summary judgment.

We must decide whether the franchise agreement and uncontroverted declarations establish that the Trujillos acted as independent contractors when they sold the clove cigarettes. Before turning to the evidence presented to the trial court, we briefly review the law of agency in the context of franchises.

## II

Franchising is a heavily regulated form of business in California,[1] but there are relatively few decisions on the nature of the relationship between franchisor and franchisee as it affects third persons. ▉ The general rule is where a franchise agreement gives the franchisor the right of complete or substantial control over the franchisee, an agency relationship exists. (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 6, pp. 24-25.) "[I]t is the right to control the *means and manner* in which the result is achieved that is significant in determining whether a principal-agency relationship exists." (*Wickham* v. *Southland Corp.* (1985) 168 Cal.App.3d 49, 59 [213 Cal.Rptr. 825], italics added.) "In the field of franchise agreements, the question of whether the franchisee is an independent contractor or an agent is ordinarily one of fact, depending on whether the franchisor exercises complete or substantial control over the franchisee. [Citations.]" (*Kuchta* v. *Allied Builders Corp.* (1971) 21 Cal.App.3d 541, 547 [98 Cal.Rptr. 588].) "Only when the essential facts are not in conflict will an agency determination be made as a matter of law." (*Wickham* v. *Southland Corp., supra,* 168 Cal.App.3d at p. 55.)

In the 1960's, the appellate courts decided three Arthur Murray Dance Studio franchise agreement cases.[2] The first, *Beck* v. *Arthur Murray, Inc.* (1966) 245 Cal.App.2d 976 [54 Cal.Rptr. 328], involved an issue of ostensible agency. No such issue is raised here; therefore, we simply note Beck's general statement of law that "mere licensing of trade names does not create agency relationships either ostensible or actual." (*Id.* at p. 981.)

In the second case, *Nichols* v. *Arthur Murray, Inc.* (1967) 248 Cal.App.2d 610 [56 Cal.Rptr. 728], the reviewing court affirmed a judgment against the

---

[1]The comprehensive Franchise Investment Law is set forth at Corporations Code sections 31000 et seq.; the Franchise Relations Act is found at Business and Professions Code sections 20000 et seq. Corporations Code section 31005 provides, in pertinent part: "(a) 'Franchise' means a contract or agreement . . . between two or more persons by which: [¶] (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and [¶] (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and [¶] (3) The franchisee is required to pay, directly or indirectly, a franchise fee."

[2]We use the words "franchise," "franchisor" and "franchisee" for convenience. The *Arthur Murray* cases speak in terms of licenses, licensors and licensees.

franchisor on an actual agency basis. The franchisor had retained controls " 'extend[ing] beyond those necessary to protect and maintain its trade mark, trade name and good will, and cover[ing] day to day details of the San Diego studio's operation.' " (*Id.* at pp. 613-614.) The franchise agreement gave the franchisor virtually absolute control of the enterprise. It allowed the franchisor: (1) to handle every aspect of employment; (2) to determine rates to be charged for lessons and whether or not to refund money to pupils; (3) to choose the lenders with whom pupil contracts would be financed; (4) to control all advertising, which the franchisee was required to submit for prior approval; (5) to compel the franchisee to honor unused dance lessons purchased at a different studio, without compensation; and (6) to cancel the franchise agreement immediately upon its determination that the franchisee was not conducting the studio in accordance with " 'the general policies of the [franchisor] as established from time to time.' " (*Id.* at p. 615.) The above recitation is representative, but not all-inclusive.

The *Nichols* court observed: "Many of the controls conferred were not related anywise to the protection of defendant's trade name, including its dancing and teaching methods, good will and business image. Other controls, although related to the protection of the trade name, because the exercise thereof was not limited to effecting such purpose, enabled defendant to impose its will upon the franchise holder in areas wholly unrelated to that purpose." (*Nichols* v. *Arthur Murray, Inc., supra,* 248 Cal.App.2d at pp. 615-616, fn. omitted.) The court also noted: "[T]here are many provisions in the agreement vesting in [the franchisor] the right to control a substantial part of the obligations incurred in the operation of the business through its right to require and assert the nature, extent and amount of most of the contemplated expenses incident to the operation." (*Id.* at p. 617.) The evidence was sufficient to support the trial court's conclusion that the franchisee acted as the franchisor's agent in dealings with third persons.

In the third case, *Porter* v. *Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410 [57 Cal.Rptr. 554], the court reviewed the provisions of two franchise agreements. It noted "[e]ach [contract] contained provisions wholly consistent with the non-existence of an agency relationship," including the requirement that each franchisee pay all the expenses of the operation and maintain liability insurance for Murray and himself. (*Id.* at p. 415.) But it pointed out a multitude of other provisions regarding Murray's right to control nearly all day-to-day management decisions and to cancel the contract immediately in the event the franchisor did not meet Murray's prescribed standards. (*Id.* at

p. 416.) Concluding its exhaustive itemization of specific contract provisions, the court found the evidence established an agency relationship. (*Id.* at p. 421.)[3]

After the Arthur Murray decisions came *Kuchta* v. *Allied Builders Corp., supra,* 21 Cal.App.3d 541. Affirming judgment on a jury verdict, the appellate court found evidence in the franchise agreement sufficient to support an implied agency theory.[4] But more importantly, there was "formidable evidence" establishing ostensible agency: Allied's vice-president referred to the franchise as a "branch office" and Allied's office as the "main office"; at both locations, phones were answered, "Allied Builders"; both the franchisor and the franchisee were doing business under the same name; plaintiff's contract listed "Allied Builders" as the contractor; the franchisor and franchisee employed common advertising; customer checks were endorsed and deposited to the account of "Allied Builders System." (21 Cal.App.3d at pp. 547-548.) In light of that evidence, the declarations of the franchise agreement regarding an independent contractor relationship were not controlling. (*Ibid.*)

*Wickham* v. *Southland Corp., supra,* 168 Cal.App.3d 49, followed. There, plaintiffs claimed the franchisor, Southland, was liable for their decedent's death, allegedly caused by a 7-Eleven store's sale of alcoholic beverages to an intoxicated minor. The jury found by special verdict there was no agency relationship on which to predicate the franchisor's liability. On appeal, plaintiffs contended the jury should have been instructed that an agency relationship exists as a matter of law if a franchisor can exercise *substantial* control over the business operations of the franchisee.

The reviewing court rejected that argument, stating a principal-agency relationship exists as a matter of law only when the franchisor can exercise *complete* control; otherwise, "the right to control [is] an important factor to

---

[3] A fourth Arthur Murray decision, *Holland* v. *Nelson* (1970) 5 Cal.App.3d 308 [85 Cal.Rptr. 117], lends nothing to our discussion. The *Holland* court simply noted that California courts in *Beck, Nichols* and *Porter* all found the existence of an agency relationship based on comparable control features of the agreement between Arthur Murray and its licensees. (*Id.* at p. 313.)

[4] "[T]here was evidence that Allied Builders exercised strong control over [the franchisee]. The franchise agreement itself gave Allied Builders the right to control the location of the franchisee's place of business, to prescribe minimum display equipment, to regulate the quality of the goods used or sold, to control the standards of construction, to approve the design and utility of all construction, and to assign persons to see that the franchisee performed according to the franchisor's standards. Additionally, Allied enjoyed the right of inspection over the franchisee's plans and specifications, the franchisee's work in progress, and finished jobs, as well as the right to train [the franchisee's] salesmen. Moreover, Allied Builders was entitled to share in the profits of the franchisee and to audit [the franchisee's] books. These elements of control were sufficient to support an implied finding of agency." (*Kuchta* v. *Allied Builders Corp., supra,* 21 Cal.App.3d at p. 547.)

be taken into consideration along with the . . . other factors enumerated [in BAJI Instruction No. 13.20]."[5] (*Wickham* v. *Southland Corp., supra,* 168 Cal.App.3d at p. 58.) While the provisions of the *Wickham* franchise agreement indicated Southland controlled some aspects of the business, contrary evidence was sufficient to support the jury's verdict. As the court stated: "[O]nly Ms. Campbell [the franchisee] and people employed by her sold beer and wine; Ms. Campbell hired and fired all employees, set their wages, paid them and gave them their day-to-day instructions; Ms. Campbell in fact controlled the manner in which the day-to-day operations of the store were conducted; and the franchise agreement specifically provided that the relationship between Southland and Ms. Campbell was that of independent contractor, not principal and agent, that employees would be the employees or agents of Ms. Campbell, that Ms. Campbell would have the sole right to employ and discharge such employees as in her judgment might be necessary, and that Ms. Campbell, her agents, representatives and employees should under no circumstances be considered or held out to be agents, representatives, servants or employees of Southland." (*Id.* at p. 54.) The court concluded: "The right to control *the result* is inherent in both independent contractor relationships and principal-agency relationships; it is the right to control the means and manner in which the result is achieved that is significant in determining whether a principal-agency relationship exists. [Citations.]" (*Id.* at p. 59.)

In the next case, *Weiss* v. *Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094 [251 Cal.Rptr. 727], plaintiff attempted to hold the defendant franchisor vicariously liable for injuries sustained as a result of the franchisee's negligence. Summary judgment in favor of the franchisor was affirmed. On appeal, plaintiff contended a triable issue of fact arose from evidence of "Chevron's control over the enterprise." (*Id.* at p. 1100.) The court noted plaintiff neither presented a factual basis "nor identifie[d] any relevant

---

[5]BAJI No. 13.20 states, in pertinent part:

"While both an agent and an independent contractor work for another person, there is an important distinction between them.

"One is the agent of another person, called the principal, if he [or she] is authorized to act for or in place of the principal and is subject to the right of the principal to control his [or her] actions.

"An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his [or her] employer only as to the results of his [or her] work, and not as to the means whereby it is to be accomplished.

"The most important factor in determining whether one is an agent or independent contractor is whether the principal has the right to control the manner and means of accomplishing the result desired. If the principal has the authority to exercise complete control, whether or not that right is exercised with respect to all details, a principal-agent relationship exists. [Strong evidence in support of a principal-agent relationship is the right to discharge at will, without cause]."

policy considerations warranting a departure from the general rule of nonliability . . . ." (*Ibid.*) "The only evidence before the trial court, the contracts and leases between Chevron and [its franchisee], expressly limited Chevron's involvement in the performance and direction of business activities and excluded it from 'any right to control [the franchisee's] business or operation or the manner in which the same shall be conducted . . . . Chevron ha[d] no right to hire or fire any employees of [the franchisee] or to exercise any control over any of [the franchisee's] employees, all of whom [were] entirely under the control and direction of [the franchisee], who shall be responsible for their acts and omissions.' " (*Id.* at p. 1100.) The court stated, "Plaintiff offered no evidence of any connection between the cause of her injuries and any aspect of the business over which Chevron did exert or could have exerted any control." (*Ibid.*)

Finally, in *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864 [269 Cal.Rptr. 647], the court stated that while other factors are to be considered, "[t]he most significant factor in determining whether . . . a person performing services for another is an employee or an independent contractor is the right to control the manner and means of accomplishing the result, that is, the details of the work. 'If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.' [Citations.]" (*Id.* at pp. 873-874.) Other factors "merely constitute 'secondary elements.' [Citations.]" (*Id.* at p. 875.) The court further stated: " ' "Perhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he [or she] sees fit to do so." ' [Citations.]" (*Ibid.*) The "unlimited right to discharge at will and without cause [is] . . . a strong factor demonstrating employment. [Citations.]" (*Ibid.*)

The cases, taken as a whole, impliedly recognize that the franchisor's interest in the reputation of its entire system allows it to exercise certain controls over the enterprise without running the risk of transforming its independent contractor franchisee into an agent.

### III

We examine Southland's evidence on the issue of agency in light of the above decisions. ■ Where, as here, the party opposing summary judgment has filed no counterdeclarations, the moving party still has the burden of establishing evidentiary facts demonstrating its entitlement to judgment. (*American Title Co.* v. *Anderson* (1975) 52 Cal.App.3d 255, 261 [125 Cal.Rptr. 24].) "[W]e review the facts presented below, independently determining their effect as a matter of law and independently reviewing the trial

court's determination of questions of law. [Citation.]" (*Wu* v. *Interstate Consolidated Industries* (1991) 226 Cal.App.3d 1511, 1514 [277 Cal.Rptr. 546].)

Colwell-Trujillo said that, as provided under the franchise agreement, she exercised "full and complete control over" the store's employees and "any and all labor relations," including "hiring, firing, disciplining, compensation . . . and work schedules." She attested, "I could purchase whatever inventory I chose and from whomever I wanted and I did so." She decided how much of any particular item to order, how frequently to order it, and what to charge for it. Colwell-Trujillo stated, "Southland had no control over my decision to sell or not sell clove cigarettes at the store. It was my sole decision to sell clove cigarettes. I alone set the prices. In no way did Southland ever advertise, promote or merchandize [*sic*] the clove cigarettes sold in my store."

Colwell-Trujillo said she "paid all operating expenses" and made "all operational decisions." She alone was responsible for "the posting of any warnings and compliance with licenses, local, state and federal ordinances, regulations, statutes and other laws." Finally, Colwell-Trujillo declared that at the time of the subject incidents, she had a "long-term" contractual relationship with Southland, as well as a "valuable propriety interest" in her 7-Eleven store. Southland could not terminate the franchise agreement prior to expiration of its express terms except for a material breach by the Trujillos.

Arthur Salcido attested to his many years of relevant experience in management positions for Southland. In addition to reiterating some of the facts set out in Colwell-Trujillo's declaration, Salcido stated that franchised 7-Eleven stores are "independently owned and operated businesses." Where 7-Eleven premises are leased by Southland, the franchise agreement is coterminous with the master lease. The Trujillo agreement, entered into in 1978, was not scheduled to end until 1995. Salcido had reviewed the Trujillos' franchise file and had found nothing in the years leading up to and including 1984 that would have warranted Southland initiating a "termination proceeding" for material breach of the agreement. With certain inapplicable exceptions, Southland's only enforcement remedy against its franchisees was to issue a 30-day notice to cure "followed by an eviction proceeding . . . when the franchise agreement is violated or good cause exists."

Salcido further stated, "Southland receives a monthly payment of a 7-Eleven charge" from the franchisee, but it "does not participate in the

[store's] net profits or losses." "Southland does not and has not ever manufactured, . . . distributed, . . . recommended, merchandised, advertised, promoted or sold clove cigarettes. Southland has never recommended that clove cigarettes be sold at the Trujillo store, has never asked the Trujillos to sell clove cigarettes, or set the prices of the clove cigarettes sold in the Trujillo store." Salcido said Southland was without power to prevent the Trujillos from selling clove cigarettes. Southland had never received a complaint about clove cigarettes, the Trujillos or their employees prior to the Cislaws' action.

The 16-page, single-spaced, fine print franchise agreement was submitted as an exhibit to both Colwell-Trujillo's and Salcido's declarations. Under the agreement, the franchisees are given the right to use the 7-Eleven system, trade name and service mark and are required to comply with certain standards. Boiled down to its essence, the agreement obligates the 7-Eleven store owners/franchisees to complete an operations training program, keep the store and its surroundings clean and maintain the equipment in good repair, carry an inventory of a "type, quality, quantity and variety" consistent with the 7-Eleven image, operate the store from 7 a.m. to 11 p.m., 364 days a year, make daily deposits of all receipts into a designated account, provide Southland with copies of purchase and sales records, make the books available for inspection during normal business hours and pay a percentage fee based on receipts from sales less cost of goods sold.

The agreement recites that the franchisees are independent contractors, and two provisions give the Trujillos the right to make all inventory, employment and operational decisions: "Article 17. Vendor Selection and Retail Pricing. OWNERS are not required to purchase merchandise from merchandise vendors recommended by, or owned by or affiliated with, 7-ELEVEN, to purchase merchandise recommended by 7-ELEVEN or to sell merchandise at retail selling prices suggested by 7-ELEVEN." Article 33(a) states: "It is the intention and understanding of OWNERS and 7-ELEVEN that OWNERS shall be independent contractors and shall control the manner and means of OWNERS' Operation. [¶] (b) OWNERS shall have the sole right to employ and discharge such employees as in OWNERS' judgment may be necessary, and such employees shall be employees or agents of OWNERS. OWNERS shall exercise full and complete control over, and shall have full responsibility for, the conduct of OWNERS' employees and any and all labor relations, including the hiring, firing, supervising, disciplining, compensation (and taxes relating thereto) and work schedules of OWNERS' employees. [¶] (c) OWNERS and OWNERS' agents, representatives, servants and employees under no circumstances shall be considered or held out to be agents, representatives, servants or employees of 7-ELEVEN."

Does the above evidence create a triable issue of fact that Southland had the all-important right to control the means and manner in which the Trujillos achieved the result? (*Wickham* v. *Southland Corp., supra,* 168 Cal.App.3d at p. 59.) We think not. Colwell-Trujillo attested she had the right to exercise, and actually exercised, "full and complete control" over all employment, inventory and marketing decisions, including the decision to sell clove cigarettes. She said she paid all operating expenses, made "all operational decisions" and was responsible for seeing to it the Trujillos' store was in compliance with local, state and federal laws. Salcido agreed the Trujillos had "sole authority" to make employment and inventory decisions and Southland had no power to prevent them from selling the clove cigarettes. In addition, the franchise agreement did not require the franchisees to purchase particular merchandise from particular vendors or to sell merchandise at suggested prices. It expressly gave the franchisees control over the manner and means of the store's operation, including the sole right to make all employment decisions. The evidence leads to the compelling conclusion that Southland did not control the means and manner.

The Cislaws claim, however, that the Trujillos' rights to run the operation are illusory and that, in reality, the franchise agreement allows Southland to control the "Financial, Executive and Operational aspects of the franchised store." We disagree. A franchisor must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and goodwill, without the risk of creating an agency relationship with its franchisees. "When one person is performing work in which another is beneficially interested, the latter is permitted to exercise a certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled. [Citations.] Even one who is interested primarily in the result to be accomplished by certain work is ordinarily permitted to retain some interest in the manner in which the work is done without rendering himself [or herself] subject to the peculiar liabilities which are imposed by law upon an employer. This must be true because, generally speaking, the quality of the work by which the final result is achieved is reflected in the finished product." (*Bohanon* v. *James McClatchy Pub. Co.* (1936) 16 Cal.App.2d 188, 199 [60 P.2d 510].)

In each of the cases in which the issue of agency survived, the franchisor retained to itself control exceeding that necessary to protect its legitimate interests. In *Nichols,* the franchisor retained power to direct all aspects of employment, all particulars of dealings between the franchisee and dance students and most matters relating to operational expenses. The franchisor was thus able "to impose its will upon the franchise holder in areas wholly

unrelated to [protecting and maintaining its trade mark, trade name and goodwill]." (*Nichols* v. *Arthur Murray, Inc., supra,* 248 Cal.App.2d at pp. 615-616.) The same was true in *Porter* v. *Arthur Murray, Inc., supra,* 249 Cal.App.2d 410, where, notwithstanding contract provisions entirely consistent with an independent contractor relationship, other contract provisions gave the franchisor the right to control day-to-day operational decisions and to terminate the agreement virtually at will. Likewise, in *Kuchta* v. *Allied Builders Corp., supra,* 21 Cal.App.3d 541, the franchise agreement gave the franchisor most of the rights which the Cislaws point to here, but also the right to control the builder franchisee's performance of every detail of its construction, from plans and specifications through work in progress to completion of the project. (*Id.* at p. 547.) Thus, there was evidence sufficient to support an implied finding of agency.

The above franchise agreements gave the franchisor control beyond that necessary to protect and maintain its interest in its trademark, trade name and goodwill. Here, however, the franchise agreement withheld from the franchisor control over decisions relating to employment, inventory and day-to-day operations of the 7-Eleven store. For this reason, the agreement could not, in and of itself, provide a basis for finding the existence of an agency relationship between the Trujillos and Southland.[6]

We now turn to a second important factor in determining whether one is an agent or an independent contractor: Did Southland have the right to terminate the relationship at will? Clearly not. Colwell-Trujillo stated she had a "long-term" contractual relationship which could not be terminated at will by Southland. Salcido stated the contract was for an 18-year term and, except for certain inapplicable breaches, Southland could not terminate except for good cause and with notice. The agreement itself bore this out. The Cislaws have pointed to nothing in the record giving rise to an inference that Southland could terminate the contract at will.

There is little, if any, evidence in the record as to the other, "secondary" factors determinative of whether an agency or independent contractor relationship exists.[7] (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra,* 220 Cal.App.3d at p. 875.) We note as to one such factor, the subjective

---

[6]The Cislaws' argument is essentially the same as that rejected by the court in *Weiss* v. *Chevron, U.S.A., Inc., supra,* 204 Cal.App.3d 1094, 1100. As we have noted, plaintiff relied solely upon the language of contracts and leases expressly excluding Chevron from directing operational or personnel decisions.

[7]BAJI No. 13.20 lists eight such factors: "(a) Whether or not the one performing services is engaged in a distinct occupation or business; [¶] (b) Whether, in the locality, the kind of occupation or business is one in which the work is usually done under the direction of a principal or by a specialist without supervision; [¶] (c) The skill required in the particular

belief of the parties as to the nature of the relationship, the Trujillos and Southland clearly thought they were creating an independent contractor relationship, as shown by the declarations and the language of the franchise agreement they signed. In any event, neither of the parties devotes more than a sentence or two to discussion of the secondary factors, and we follow suit. We merely observe that once Southland established without controversy that (1) it did not control the means and manner in which the Trujillos ran the store, and (2) the agreement was not terminable at will, nothing more was necessary. The Cislaws were not entitled to proceed to trial on their agency theory.

## IV

We briefly address the Cislaws' half-hearted contention that triable issues of fact exist as to a partnership or joint venture theory of recovery. ■ As Southland correctly observes, the Cislaws did not raise a partnership or joint venture theory in their complaint or in opposition to the motion for summary judgment. "As a general rule an appellate court will consider only such points as were raised in the trial court, and this rule precludes a party from asserting, on appeal, claims to relief not asserted or asked for in the court below. [Citations.]" (*Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 505-506 [227 Cal.Rptr. 318].) As a matter of discretion, however, the appellate court may consider a theory raised for the first time on appeal where a pure question of law can be determined by reference to uncontroverted facts. (*Id.* at p. 506.) Such is the case here.

■ The Cislaws base their argument regarding partnership or joint venture on Southland's purported right to share profits of the 7-Eleven store with the Trujillos. Salcido attested the Trujillos paid a monthly 7-Eleven franchise fee to Southland, consisting of a percentage of the total sales receipts after deduction of cost of goods sold. Salcido stated Southland did not participate in the store's net profits or losses. The franchise agreement bears this out.

"[I]t is well established that the essential elements of both a joint venture and partnership are a sharing of profits as well as losses and a right to joint management and control of the business. [Citations.]" (*People* v. *Park* (1978) 87 Cal.App.3d 550, 564 [151 Cal.Rptr. 146].) " '[T]he mere fact that one

occupation or business; [¶] (d) Whether the principal or the [worker] supplies the instrumentalities, tools and the place of work for the person doing the work; [¶] (e) The length of time for which the services are to be performed; [¶] (f) The method of payment, whether based on time or by the job; [¶] (g) Whether or not the work is part of the regular business of the alleged principal; and [¶] (h) Whether or not the parties believe they are creating a relationship of agency or independent contractor."

party is to receive benefits in consideration of services rendered or for capital contribution does not . . . make him [or her] a . . . joint venturer. [Citations.]' " (*Gradus* v. *Hanson Aviation, Inc.* (1984) 158 Cal.App.3d 1038, 1058 [205 Cal.Rptr. 211].)

There is no evidence showing Southland and the Trujillos shared the profits and losses of the enterprise. And, as we have discussed at length, nothing in the record demonstrates Southland has the right to joint management and control of the business. The Cislaws were not entitled to try the case on a theory of partnership or joint venture.

Finally, the Cislaws allude to Southland's actual or presumed knowledge of dangers of the clove cigarettes, but they point to no evidence in the record and they present no argument regarding a basis for imposing independent liability on Southland. Consequently, we deem the point to have been waived. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

Judgment affirmed. Respondent is to recover costs of appeal.

Sills, P. J., and Moore, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 10, 1992.