[No. C036193. Third Dist. Jan. 8, 2002.]

PAUL R. EMERY, JR., Plaintiff and Appellant, v.
VISA INTERNATIONAL SERVICE ASSOCIATION et al., Defendants
and Respondents.

## COUNSEL

Law Office of Richard Ellers and Richard F. Ellers for Plaintiff and Appellant.

Legal Strategies Group, Joshua R. Floum, Timothy R. Cahn and Ariela F. St. Pierre for Defendants and Respondents.

## OPINION

**RAYE, J.**—Plaintiff Paul R. Emery, Jr., brought the underlying action against defendants Visa International Service Association and Visa U.S.A. Inc. (VISA) for unfair and unlawful business practices and deceptive advertising because foreign lotteries, in written solicitations to California residents, allow payment by VISA bank cards. Plaintiff, who never purchased a foreign lottery ticket and is not sure he ever received a solicitation, admits that VISA played no role in the creation or mailing of the solicitations. Nevertheless, plaintiff asserts that VISA can be held vicariously liable, both criminally and civilly, for the over 14 million merchants worldwide who accept VISA payment cards.

The trial court granted VISA's motion for summary judgment, rejecting plaintiff's theory that VISA's advertising, licensing of its logo, and utilization of its payment system creates either an actual or ostensible agency relationship with its merchants. The court also rejected plaintiff's notion that VISA somehow aided and abetted the unlawful solicitation of California residents to play foreign lotteries by failing to prevent the exploitation of its logo and failing to sufficiently repudiate the acts of merchants who accept VISA bank cards. (Pen. Code, §§ 319, 320, 321.)

This lawsuit is misconceived legally and factually. As a so-called consumer protection action, it lacks a defendant who has engaged in any

wrongful conduct and consumers who have been harmed. Because plaintiff, a misguided private attorney general, has failed to identify any triable issues of fact and bases his lawsuit on mistaken legal concepts of expansive civil and criminal liability where none exists, we affirm.

## FACTS

Although California sponsors its own lottery, the solicitation or sale of foreign lottery chances is unlawful. (Pen. Code, §§ 319, 320, 321.) Such solicitations were sent to at least seven residents of Nevada County. These solicitations allow the gambler to pay by choosing one of several credit cards such as American Express, MasterCard, Access, EuroCard, VISA, or Diners.

### The Alleged Victims

Of the seven witnesses who purportedly received the solicitations, only three bought lottery tickets.[1] Margaret Larue was 84 years old and resided in a convalescent home. When John Larue, her son and conservator, discovered his mother had purchased over $10,000 worth of chances in foreign lotteries using her VISA bank card, he complained to his mother's bank and $9,500 in charges were reversed. Of course, John Larue was incompetent to testify to his mother's state of mind when she purchased the tickets and to what factors motivated her to play. Janet Berliner purchased lottery tickets a couple of times by check; there is no evidence in the record that the presence of the VISA mark on the solicitation influenced her in any way. Victory Daniels, who had participated in foreign lotteries or sweepstakes 500 to 1,000 times in the 20 years preceding her deposition, had only recently obtained bank cards and "barely used" them for lotteries or sweepstakes. She testified at her deposition that the presence of the VISA name as a payment option looked "impressive" and gave the solicitations the appearance of legitimacy.

The others did not purchase any lottery tickets. In fact, the lead plaintiff did not recall if he had ever received a solicitation. James Huth had no recollection if any of the solicitations he received contained the VISA mark, and he would have ignored it if they had. He owned no credit cards. Anita Wald-Tuttle tossed the five solicitations she received in the last 10 years into the recycle bin. Foyal Sneed received solicitations from Germany, but he, like the others, never bought a ticket and did not claim the VISA mark had influenced him in any way.

---

[1] The trial court struck the declaration of witness Helen E. Harte because she resides in Florida and received and responded to lottery solicitations only in Florida, not in California.

*The Alleged Wrongdoer*

Plaintiff, in his role as private attorney general, filed the underlying action in February 1999, naming only VISA as a defendant. VISA, however, did not issue a bank card to any of plaintiff's witnesses. Indeed, VISA does not issue bank cards to consumers. Nor does VISA charge consumers fees for its services or contract with merchants to display the VISA mark or to accept VISA bank cards. Simply put, VISA has no contractual relationship with consumers or merchants. Its relationship is with its members, autonomous financial institutions.

VISA provides a medium for interchange and settlement among the financial institutions that lend to consumers and transfer funds to merchants. VISA is an international organization of over 20,000 autonomous financial institutions located in 240 countries and territories. Through its worldwide computer system, VISA acts as a clearinghouse for credit, debit, and funds transfer transactions among its member financial institutions. It processes over 2,700 transactions every second during its peak season and is capable of handling transactions denominated in 160 currencies. At the time of the hearing on the motion for summary judgment, over 14 million businesses worldwide accepted VISA payments.

VISA enters into contractual relationships with member financial institutions, authorizing them to use the VISA payment system and the VISA mark. "Acquiring" member institutions then enter into separate contracts with merchants to display the VISA mark and to accept, in lieu of cash, VISA bank cards as a form of payment. "Issuing" member institutions enter into contracts with consumers whereby consumers obtain their VISA bank cards. VISA does not set the interest rate or any of the terms and conditions of the consumer's card. It does, however, publish operating regulations that govern each member institution's participation in the VISA payment system. Those regulations do not permit the use of the VISA mark or services in a manner prohibited by applicable law and specifically prohibit any merchant from indicating or implying that VISA endorses any goods or services.

As a consequence, VISA is not involved either in transferring funds to merchants or in billing cardholders. Nor does VISA receive any fee from either the cardholder or the merchant involved in a particular transaction.

*The Foreign Lotteries*

Plaintiff does not contend that VISA either knew about or facilitated the solicitation mailings. In fact, plaintiff admitted VISA was not involved in the

preparation or distribution of the solicitations. The thrust of plaintiff's action is that VISA, once learning of the payment option provided in the solicitations, should have done more to stop the solicitations containing its mark.

VISA submitted evidence to demonstrate ongoing cooperation with law enforcement in investigating illegal conduct involving the use of bank cards, including investigations of lottery businesses when they engage in unlawful activities. In reply, VISA provides some poignant examples as follows: "[I]n October of 1997, Visa participated in an investigation in cooperation with U.S., Canadian and Australian law enforcement into a business calling itself 'SL Marketing.' [Citations.] After it was determined that this merchant was laundering sales drafts for an illegal Canadian lottery business, Pools International, Visa worked with the merchant's bank in Australia to terminate SL Marketing's account, and eventually the merchant was shut down. [Citations.] Similarly, in March through May of 1997, Visa cooperated with the Federal Trade Commission in investigating another merchant, 'ATMS' or 'Woofter,' that was laundering drafts for Canadian lottery telemarketers. [Citations.] The information gathered by Visa as part of this investigation—including identifying the principals behind the scheme—was passed on to the FTC, which filed for injunctive relief and eventually reached a settlement permanently prohibiting the merchant from providing credit card processing for any other business. [Citations.] [¶] Visa also assisted the U.S. Customs Service and several state attorneys general in 1995 and early 1996 in their investigation (dubbed 'Project Rainbow') of Canadian telemarketers that were selling Canadian and Australian lottery tickets to U.S. cardholders, and then laundering the drafts through U.S. merchants. [Citations.] Working with law enforcement and Visa's Canadian group member, Visa Canada Association, Visa secured information vital to the investigation and prosecution of the telemarketers—including the names of companies and principals involved in the scheme, and the banks and consumers they had victimized—and succeeded in closing the laundering U.S. merchants down."

Plaintiff cited the same evidence but drew a different inference. Plaintiff suggests that VISA's involvement indicates complicity, not cooperation. He argues that VISA did not send any cease-and-desist letters to merchants until five months after the complaint in this case was filed. Moreover, according to plaintiff, VISA has not been proactive in protecting the use of its mark.

*The Communications Expert*

Plaintiff asked his communications expert to render his opinion as to whether the presence of the VISA trade name or logo increases the likelihood that a reasonable reader of a lottery solicitation will participate in the

lottery and whether the trade name or logo legitimizes the lottery. This expert opined that the VISA card is seen as "a ticket to the good life." Therefore, according to "classical conditioning theory and research," the trade name and logo are functional equivalents to the use of positive adjectives to favorably dispose the reader to buy a lottery ticket. Use of a ticket to the good life legitimizes the lottery.

The expert also emphasized that the presence of the VISA trade name or logo unconsciously encourages readers to participate. He provided the results of a sophisticated study. "For example, researchers have exposed subjects to photographs of happy and or sad faces for extremely brief durations. These exposures are so short that subjects cannot recall having seen the faces. Nonetheless, ratings of initially neutral stimuli (Chinese ideographs) made after subliminal exposure to happy faces are more positive, while ratings of initially neutral stimuli made after exposure to sad faces are negative." In other words, the presence of the ticket to the good life provokes a happy face and, in this case, a happy gambler.

*The Complaint*

The complaint alleges four causes of action. In the first cause of action for false and/or misleading advertising (Bus. & Prof. Code, §§ 17500 & 17535[2]), plaintiff alleges that VISA authorizes merchant accounts that, in turn, allow the VISA logo, trademark, and trade name to be used to solicit California consumers to purchase chances of entry in foreign lotteries. The use of the VISA logo, trademark, and trade name falsely advertises the lotteries as legitimate and misleads the consumer to purchase chances based on the VISA endorsement.

In the second cause of action, plaintiff asserts that VISA's conduct constitutes unfair business practices in violation of section 17200.

In the third cause of action, plaintiff seeks to enjoin VISA's alleged unlawful conduct. He asserts that VISA's acts "in allowing the use of their logos, tradenames, and trademarks in connection with such lotteries and in facilitating and profiting by the conduct of such lotteries constitute aiding, assisting, maintaining, endorsing, legitimizing, promoting and receiving a portion of the consideration from the maintenance of illegal lotteries within the State of California prohibited by California Penal Code Sections 319 through 328."

Whereas the third cause of action asks the court to enjoin the unlawful conduct and to restore the money received by VISA to those who purchased

[2]All further statutory references are to the Business and Professions Code unless otherwise indicated.

lottery tickets, the fourth cause of action seeks forfeiture of the moneys received by VISA to the state. There is a prayer for attorney fees.

*The Ruling*

The trial court rejected plaintiff's allegations of actual or ostensible agency as well as agency by ratification. The court also concluded there had been no unfair competition as a matter of law. The court explained: "There are approximately 14,000,000 merchants authorized to use the Visa payment system and logo. There are millions of transactions per day. As a matter of law, the fact that a few of those merchants are operating illegally does not impose liability on Visa because those merchants use the Visa logo in their mailings so that consumers may charge their purchases through the Visa payment system. When comparing the use of the payment system and logo by a few unscrupulous merchants to enable consumers to charge illegal lottery purchases against the reasons, justifications and motives of Visa, the utility of defendants' conduct outweighs the gravity of harm to the alleged victims. As a matter of law, Visa's conduct is not 'unfair' within the meaning of the unfair competition law."

Moreover, the court held that although the scope of liability under the unfair competition statutes was broad, it was not so broad "that liability is properly imposed on Visa based on the facts that Visa states consumers consistently choose Visa over other credit cards, advertises itself 'as a trusted seal of approval' to increase consumer confidence in Visa merchants, urges merchants to utilize the Visa system and to display the Visa logo, and authorizes use of its logo by merchants."

Finally, the court rejected plaintiff's theory that VISA had aided and abetted the foreign merchants by failing to stop the solicitations. The court held: "Aiding and abetting requires proof of rendering aid with an intent or purpose of either committing, encouraging, or facilitating commission of the target offense. This requires knowingly aiding with guilty knowledge. The mere facts that Visa licenses its logo and mark to member institutions and they in turn allow merchants to utilize the mark, even coupled with knowledge by Visa that some of the merchants using the mark are conducting illegal activities, do not equate [to] aiding and assisting." Judgment was entered for VISA.

## DISCUSSION

### I

Plaintiff, presented with the factual obstacles that VISA did not help prepare or know about the inclusion of its logo and payment option on

the solicitations, asserts a circular agency theory whereby the merchants are VISA's agents and VISA itself is the agent of the member institutions. His argument is fatally flawed on any number of grounds.

We need go no further than to remind plaintiff that his unfair practices claim under section 17200 cannot be predicated on vicarious liability. "The concept of vicarious liability has no application to actions brought under the unfair business practices act." (*People v. Toomey* (1984) 157 Cal.App.3d 1, 14 [203 Cal.Rptr. 642] (*Toomey*).) A defendant's liability must be based on his personal "participation in the unlawful practices" and "unbridled control" over the practices that are found to violate section 17200 or 17500. (*Toomey, supra,* 157 Cal.App.3d at p. 15.) Unlike Mr. Toomey, VISA exercised no control over the preparation or distribution of the solicitations, nor did it have any relationship with the merchants who did.

Plaintiff's multiple theories of agency fare no better as a matter of fact or as a matter of law. We, of course, hunt only for triable issues of fact in order to determine whether the summary judgment was properly granted. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) As the trial court repeated many times, there are no disputed factual issues. ■ When the essential facts are not in conflict and the evidence is susceptible to a single inference, the agency determination is a matter of law for the court. (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358].)

■ There is no actual agency. Plaintiff presented no evidence of any agency agreement between VISA and the lottery merchants, and while VISA does contract with member financial institutions, plaintiff points to no provision establishing an agency relationship.

Nor is there evidence that VISA exercised a right to control the lottery merchants so as to create an agency by conduct. (*Cislaw v. Southland Corp.* (1992) 4 Cal.App.4th 1284, 1288 [6 Cal.Rptr.2d 386] (*Cislaw*).) The evidence, in fact, was to the contrary. VISA does not approve merchants, does not endorse their activities, does not authorize any particular merchant transactions, and has no say whatsoever in how the merchants operate their day-to-day businesses. Indeed, the unrefuted evidence shows that VISA has no regular, direct dealings at all with any of the merchants. VISA merely makes available a payment system to member financial institutions, which merchants can use, and adjusts credit transactions among those members.

Plaintiff argues that VISA delegates its authority over its trademark to its member institutions and relies on those institutions to monitor the legality of

the merchants' enterprises. Again, the law is clear and dispositive. A trademark owner's grant of permission to another to use the owner's mark, combined with efforts to "police" such use, do not make the user the agent or intermediary of the owner. (*Cislaw, supra*, 4 Cal.App.4th at p. 1296.) The owner may retain sufficient control to protect and maintain its interest in the mark without establishing an agency relationship.

Plaintiff insists that VISA cloaks its merchants with ostensible authority by allowing them to promote the foreign lotteries. ■ But ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct. (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 747 [69 Cal.Rptr.2d 640] (*Kaplan*).) In *Kaplan*, a superior court judge, who was a sophisticated real estate investor, did business with what he thought was Coldwell Banker. In fact, the broker was an independent contractor, but the judge failed to notice the small print disclaimer displayed beneath the prominently featured "Coldwell Banker" sign. The Court of Appeal found, in reversing a summary judgment for Coldwell Banker, there were triable issues of fact as to whether the broker was an ostensible agent of Coldwell Banker, the franchisor. (*Id.* at p. 748.)

■ Here, plaintiff offered no evidence to give rise to a reasonable inference of ostensible authority for a merchant to act on its behalf. There is no evidence that VISA's Internet Web site, its advertisements, or any other representations contained a single reference to foreign lotteries or could be construed as an endorsement of the merchants' ability to represent VISA. While plaintiff relies on VISA's general advertising promoting the merits of the VISA payment system, we agree with the trial court that such advertisement does not raise a reasonable inference of ostensible agency.

Even if VISA did nothing to create an agency before the solicitations were mailed, according to plaintiff, it established an agency relationship by ratifying the endorsement after the solicitations were mailed and received. Plaintiff maintains that VISA knew its logo was being used, derived financial gain from the exploitation, and did little to stop the foreign merchants from continuing to use the logo and accept VISA payments. Again, plaintiff distorts the law and the facts.

■ A principal cannot ratify the act of the alleged agent, unless the "agent" purported to act on behalf of the principal. (*Watkins v. Clemmer* (1933) 129 Cal.App. 567, 570-571.) ■ Hence, here the merchants would have had to purport to act for VISA and not for their own benefit. The mere display of the VISA logo, trade name, or trademark is simply not

enough to establish an agency by ratification. The foreign merchants did not purport to act for VISA.

Moreover, we reject plaintiff's twisting of the facts to fit the requirement that the purported principal ratifies an agent's conduct and thereby creates an agency by ratification by accepting the benefits of the illegal lottery transactions carried out through its system. Any such benefit is too remote to constitute ratification. VISA received fees from adjusting credit transactions among member financial institutions, not from merchants or customers engaged in any particular transaction.

The trial court also rejected plaintiff's notion that VISA somehow ratified the transactions by belatedly sending benign cease-and-desist letters and cooperating with law enforcement investigations. VISA's cooperation does not translate into ratification.

In essence, plaintiff ascribes vicarious liability to VISA for its failure to police millions of merchants who allow payment with a VISA bank card. While such expansive responsibility may be plaintiff's idea of needed social policy, he fails to present evidence of any viable theory of agency. In the absence of sufficient evidence to raise a genuine triable issue of fact, his lawsuit fails, along with his misguided notion of consumerism.

## II

The trial court aptly summed up the remainder of our opinion. "Absent an agency relationship between Visa and Visa merchants, there is little basis for contending Visa is liable for violation of the anti-lottery criminal statutes or the unfair competition law." We, however, would change "there is little basis" to "there is no basis." Plaintiff simply fails to offer any evidence of either wrongdoing or intent.

Section 322 of the Penal Code provides that "[e]very person who aids or assists, either by printing, writing, advertising, publishing, or otherwise in setting up, managing, or drawing any lottery, or in selling or disposing of any ticket, chance, or share therein, is guilty of a misdemeanor." To establish aiding and abetting liability under Penal Code section 322, plaintiff must show that VISA affirmatively participated in the lottery businesses' activities with the intent to facilitate them. ■ In order to be held as an "accomplice," a person must have "knowingly aided" a lottery venture with "guilty knowledge" of the scheme to set up the lottery. (*People v. Jones* (1964) 228 Cal.App.2d 74, 95 [39 Cal.Rptr. 302].) Knowledge of, or failure to prevent, a crime is not sufficient to establish aiding and abetting liability.

(*People v. Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].)

Two cases are analogous. *Kools v. Citibank, N.A.* (S.D.N.Y. 1995) 872 F.Supp. 67 involved an issuing bank's liability to an undisclosed principal for a letter of credit. The court held that the purported principal had no standing to sue the bank. The court's rationale is useful for our purposes. The court held that the issuer "remains immune from all 'responsibilities to police the underlying transaction.' . . . The issuing bank concerns itself only with the applicant's financial reliability, and it is on this basis alone that the bank becomes involved in a transaction. For a bank to be liable even potentially to undisclosed principals would force it to investigate the background of other entities or persons. Forcing an issuing bank into this investigative role would conflict with the goals of increasing the efficiency of commercial transactions, and limiting the liability of issuing banks." (*Id.* at p. 72.)

*People v. Brophy* (1942) 49 Cal.App.2d 15 [120 P.2d 946] (*Brophy*) brings us into the criminal arena. In *Brophy*, Earl Warren, then the California Attorney General, requested a telephone company to discontinue service to a customer who furnished information to bookmaking establishments through the use of the telephonic equipment furnished by the telephone company. (*Id.* at pp. 19-20.) The court squarely held, albeit in a different context, that the telephone company could not be classed as an aider and abettor to violation of the laws against bookmaking in the state. (*Id.* at p. 33.) "Simply because persons who received information transmitted over the telephone facilities were enabled as a result of such information, if they were so inclined, to commit unlawful acts, does not make the telephone company a violator of the criminal laws." (*Ibid.*)

▆▆ The same is true here. VISA was merely the conduit. The availability of its payment system does not expose it to criminal liability as an aider and abettor. Nor are there any facts to give rise to a reasonable inference that VISA knew of the unlawful solicitations, facilitated their distribution, or in any manner "rendered aid with an intent or purpose of either committing, or of encouraging or facilitating," violation of the antilottery penal statutes of this state. (*People v. Beeman* (1984) 35 Cal.3d 547, 551 [199 Cal.Rptr. 60, 674 P.2d 1318].)

### III

Plaintiff accuses VISA not only of violation of the criminal law as an aider and abettor, but also of unfair business practices as proscribed by

sections 17200 and 17500. Section 17200 authorizes injunctive and other equitable relief against any "fraudulent business act or practice" or "misleading advertising." Section 17500 makes it unlawful for "any person . . . with intent directly or indirectly to dispose of real or personal property or to perform services" to "make or disseminate or cause to be made or disseminated" any statement "concerning any circumstance or matter of fact connected with the proposed performance or disposition" of the property or service "which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." In short, plaintiff accuses VISA of fraud and false advertising.

Without the help of vicarious liability, plaintiff again meets an insurmountable hurdle. He attempts to ascribe liability for fraud and false advertising based on VISA's omission rather than commission. He seeks to impose liability on VISA because it failed to stop lottery merchants from improperly using its mark and because its mark allegedly implied to consumers that the merchants' statements were true. But plaintiff concedes that VISA itself played no part in preparing or sending any "statement" that might be construed as untrue or misleading under the unfair business practices statutes. Hence, there can be no civil liability for unfair practices.

Moreover, the law is clear that even if VISA allowed the merchants to use its logo, trade name, or trademark, it would not be liable for false advertising. There is no duty to investigate the truth of statements made by others. (*McCulloch v. Ford Dealers Advertising Assn.* (1991) 234 Cal.App.3d 1385, 1391 [286 Cal.Rptr. 223]; *Walters v. Seventeen Magazine* (1987) 195 Cal.App.3d 1119, 1122 [241 Cal.Rptr. 101].) The use of such a mark does not constitute an endorsement. (*New Kids on the Block v. New America Pub., Inc.* (9th Cir. 1992) 971 F.2d 302, 308-309.) We accept VISA's apt conclusion. "[Plaintiff's] argument that Visa should be subject to liability for a lottery merchant's unauthorized use of its mark on a solicitation mailed into California distorts state false advertising laws beyond recognition and would impose a significant, unprecedented burden on Visa. Indeed, for a court to impose liability in this context, and to require Visa somehow to police each and every communication made by the millions of merchants displaying its logo or mark, would have a substantial chilling effect on *all* payment systems . . . by imposing debilitating costs and improperly shifting law enforcement functions to private entities."

Because we conclude that VISA's failure to act does not amount to an unfair business practice, we need not address plaintiff's argument that reasonable California consumers were likely to be deceived by any lottery merchant's nominative use of the VISA mark on lottery solicitations. Neither

the communications expert nor the witnesses' vague assertions about what they believed can create liability where there is none.[3] VISA's liability turns on its own conduct, not on what hypothetical or misguided consumers might have believed when they saw the VISA mark.

Finally, we, like the trial court, reject plaintiff's allegation that any reference to the VISA payment system as a "seal of approval" constitutes false and misleading advertising. The reference to a "seal of approval" cannot be divorced from the context in which it is used. In VISA's advertising and on its Internet Web site, VISA states that the VISA payment system can be seen as a "seal of approval" that member institutions "can use as a platform to meet their objectives for increasing consumer confidence, enhancing customer relationships and ultimately driving usage in new markets." In this context, the statement is neither false nor misleading because member institutions may enhance their relationships with customers by becoming members of the VISA system.

In closing, we remind plaintiff that his causes of action under sections 17200 and 17500 are both premised on the fundamental principle that a business practice is unfair. ▪ " '[T]he determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.' " (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167 [93 Cal.Rptr.2d 439].) ▪ Plaintiff's lawsuit is conceptually and factually flawed quite simply because he fails to demonstrate an unfair practice. There is little evidence that any California consumer has been victimized. In fact, the record demonstrates just the opposite. Margaret Larue, the only elderly, vulnerable woman purportedly harmed by VISA's payment option, was actually better off for having used her VISA card. Had she written a check or paid by money order, she would have lost $10,000, but because she used her VISA card, her bank refunded $9,500.

Plaintiff offers no evidence that VISA entertained any wrongful motives. Indeed, VISA did nothing to advertise its logo on the solicitations and cooperated with law enforcement in curbing the practice. The worst that can be said is that it did not take more aggressive corrective steps to curtail the use of its mark on the solicitations. Given the millions of merchants that use the VISA payment system and the millions of transactions it processes daily,

---

[3]Plaintiff complains that the trial court disregarded the declaration of a resident of Florida. The court found her declaration irrelevant to the issues raised in the California litigation. We need not consider plaintiff's claim of error because, as we explain above, we can find no unfair business practice by VISA, whatever consumers may or may not have believed.

we are unwilling to foist upon VISA the onerous role of the global policeman plaintiff seems to think it should be.

The judgment is affirmed.

Scotland, P. J., and Davis, J., concurred.